Sandip SHAH, Plaintiff–Appellant,

v.

Mary MEEKER, Morgan Stanley &
Co., Philip J. Purcell and Morgan
Stanley, Defendants–Appellees.

Docket No. 04–5965–CV.

United States Court of Appeals,
Second Circuit.

Argued Sept. 15, 2005.

Decided Jan. 20, 2006.

IRA Press, New York, N.Y. (Kirby McInerney & Squire, New York, NY, of counsel), for Plaintiff–Appellant.

Peter D. Doyle, New York, N.Y. (Alexander Dimitrief, Steven A. Engel, Kirkland & Ellis, New York, NY, of counsel), for Defendants–Appellees.

Before: MESKILL and CABRANES, Circuit Judges, and MUKASEY, District Judge.[1]

MESKILL, Circuit Judge.

Sandip Shah, lead plaintiff for a putative class of holders of publicly traded Morgan Stanley common stock, appeals from the dismissal by the United States District Court for the Southern District of New York, Holwell, *J.*, of his securities-fraud action against Morgan Stanley, its subsidiary Morgan Stanley & Co., Inc. (collectively, "Morgan Stanley" or "the firm"), its chairman and Chief Executive Officer, Philip J. Purcell, and senior analyst and managing director of Morgan Stanley & Co., Inc., Mary Meeker. The crux of Shah's complaint is that defendants' conflicts of interest arising from their issuing analyst reports rating and evaluating actual or potential investment banking clients of the firm—together with the firm's failure to disclose these improper business practices to its own shareholders—artificially inflated the price of Morgan Stanley stock purchased between July 1, 1999 and April 10, 2002 (the class period).

Defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), as well as the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(b), and to strike certain allegations pursuant to Federal Rule of Civil Procedure 12(f).

Finding that plaintiff was on inquiry notice more than two years before filing suit, the district court concluded that the claims were time-barred and granted defendants' motion to dismiss the complaint. For the reasons set forth below, we affirm.

BACKGROUND

This lawsuit follows on the heels of a year-long investigation by the Attorney General of the State of New York (Attorney General) and the Securities and Exchange Commission (SEC) into the practices of Morgan Stanley's securities analysts. In April 2003 the Attorney General issued his findings and conclusion that Morgan Stanley used its stock analysts' research as a tool to win investment banking business. Morgan Stanley's analysts performed investment banking functions and were compensated based on their effectiveness in securing investment banking business for the firm; as a result, it is alleged, they faced a major conflict of interest and failed to produce the objective research reports that Morgan Stanley claimed to give its customers. Based on these findings, the Attorney General, SEC, National Association of Securities Dealers (NASD), New York Stock Exchange (NYSE) and state

---

**1.** Honorable Michael B. Mukasey, United States District Judge for the Southern District of New York, sitting by designation.

regulators filed claims against Morgan Stanley for violations of NASD and NYSE rules. The firm settled these claims on April 28, 2003 for $125 million in penalties and restitution.

Classes of investors have filed numerous lawsuits against Morgan Stanley and other financial institutions alleging securities fraud based on the conflicts uncovered by the agency investigations. *See, e.g., Fogarazzo v. Lehman Bros.,* 341 F.Supp.2d 274 (S.D.N.Y.2004); *Demarco v. Lehman Bros.,* 309 F.Supp.2d 631 (S.D.N.Y.2004); *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 431 (S.D.N.Y.2003); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 289 F.Supp.2d 416 (S.D.N.Y.2003); *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267 (S.D.N.Y.2003); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 272 F.Supp.2d 243 (S.D.N.Y.2003); *Pfeiffer v. Goldman, Sachs & Co.,* No. 02 Civ. 6912, 2003 WL 21505876 (S.D.N.Y. July 1, 2003); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 273 F.Supp.2d 351 (S.D.N.Y.2003). But there is an important distinction between the Sandip Shah lawsuit and the others.

In the other lawsuits, the plaintiffs invested in the securities of a publicly traded corporation—not a party to the suit—in reliance on overly sanguine recommendations of the defendant securities broker and suffered a loss when the value of the non-party corporation's stock decreased. Here, by contrast, the plaintiff owned stock in the defendant securities broker, Morgan Stanley, itself and allegedly suffered a loss when Morgan Stanley's improper business practices came to light and the value of its own stock decreased. The nature of the fraud alleged is thus different: whereas the usual claim is that defendants made false and misleading statements in overrating particular securities, Shah contends that Morgan Stanley's fraud lay in its statements showcasing its analysts and their reports as unbiased and objective.

## I.

We set forth the facts asserted in the complaint and assume their truth for purposes of evaluating a motion to dismiss. *See* Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

## A.

In the equity research business, Morgan Stanley's stock analysts provide individual and corporate clients with ratings and recommendations regarding the securities of publicly traded companies. Throughout the class period, the firm's analysts rated publicly traded stocks according to an ostensibly objective four-level ratings system.[2]

Like other prominent financial institutions, Morgan Stanley also provides investment banking services. In its capacity as an investment bank, the firm helps its corporate clients to acquire financing, primarily through the issuance of securities, and during the class period often served as the lead underwriter in its clients' securities offerings. Morgan Stanley was particularly active as a lead underwriter during

---

**2.** At the outset of the class period, the firm designated stocks as "strong buy," "outperform," "neutral," or "underperform." In or around February 2002, Morgan Stanley replaced the previous system with another, whereby stocks were rated as "overweight," "equal-weight," "underweight," or "more volatile."

the "dot-com" boom of the late 1990s, when Wall Street securities firms were presented with myriad opportunities for lucrative investment banking business. During this period Morgan Stanley and other firms competed to underwrite and issue the initial public offerings (IPOs) of stock in the new technology companies because the IPOs themselves generated banking fees for Morgan Stanley and promised future investment banking business through secondary stock offerings, loans and other corporate financing transactions, as well as mergers and acquisitions.

Under NASD and NYSE regulations, a "Chinese Wall" was required to prevent the conflicts of interest that could obviously result when a firm analyzes and recommends the very securities it has itself issued or underwritten. Indeed, Morgan Stanley continuously published statements regarding its stock rating system, the quality of its research, its high ethical standards and compliance with the industry's rules and regulations, the awards that the firm and its analysts had received, and standard disclaimers regarding the firm's dual roles. *See Shah v. Stanley,* No. 03 Civ. 8761, 2004 WL 2346716, at *2 (S.D.N.Y. Oct.19, 2004).

### B.

Years before the beginning of the class period, the financial press were reporting that "[t]he recommendations by underwriter analysts show significant evidence of bias and possible conflict of interest," Roger Lowenstein, *Today's Analyst Often Wears Two Hats,* Wall St. J., May 2, 1996, at C1, and that "[t]he pressure on analysts is growing [because t]he Chinese wall that existed at most brokerage houses between analysts and investment bankers has broken down," John Hechinger, *Analysts May Hate to Say "Sell," But a Few Com-*

*panies Do Hear It,* Wall St. J., Apr. 8, 1998, at NE2, *available at* http://online.wsj.com/article/SB89197475215861500.html (internal quotation marks omitted).

Such reports were not confined to generalities. Mary Meeker was specifically named, and her ethically questionable practices described, in articles featured in *The New Yorker* as well as in financial publications like *Fortune. See, e.g.,* John Cassidy, *The Woman in the Bubble, The New Yorker,* April 26 & May 3, 1999, at 48; Erick Schonfeld, *The High Price of Research; Caveat Investor: Stock and Research Analysts Covering Dot–Coms Aren't As Independent As You Think, Fortune,* March 20, 2000, at 118; Peter Elkind, *Where Mary Meeker Went Wrong, Fortune,* May 14, 2001, at 68 (Elkind). For example, *Fortune* named Meeker as one of a group of Wall Street analysts who were "increasingly deriv[ing] a portion of their compensation, directly or indirectly, from the companies they cover." Schonfeld, at 118. "That," *Fortune* reported, "helps put pressure on the quality of their work and encourages them to become more like cheerleaders than independent observers." *Id.* at 118–20.

### C.

After years of such reporting from the financial press, the Attorney General announced his investigation of Morgan Stanley in April 2002. *See Shah,* 2004 WL 2346716, at *6–*7. Morgan Stanley stock immediately dropped in value by 5.27%. *See id.* at *7. Less than a month later, when the SEC ordered that Morgan Stanley turn over documents relating to conflicts of interest, the firm's stock dropped another 6.2%. *See id.* In April 2003, the Attorney General published its findings and conclusions in connection with the $125 million settlement. *See id.*

Shah filed suit on July 18, 2003 on behalf of a putative class of those who purchased Morgan Stanley common stock between July 1, 1999 and April 10, 2002. Shah brought claims under sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, as modified by the PSLRA, 15 U.S.C. § 78u–4(a), *et seq.*

## II.

Under Rule 10b–5, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

Shah does not allege that any analyst report regarding any specific company was false or misleading because it was tainted by the above-described conflicts of interest. Rather, he alleges that the statements regarding the objectivity of these ratings, as well as those regarding the high quality and independence of Morgan Stanley's stock analysts, were materially false and misleading.

The statements regarding the accuracy and objectivity of Morgan Stanley's research were false and misleading, Shah alleges, because they failed to disclose a number of improper business practices, specifically: (1) tying research analysts' compensation to Morgan Stanley's investment banking business, (2) offering companies favorable research coverage in order to gain their investment banking business, (3) initiating or terminating research coverage and rating stocks based on prospects of attracting investment banking business, and (4) a general failure to establish adequate procedures to protect research analysts from conflicts of interest. "Accordingly," the complaint alleges, "Morgan Stanley was in fact using investment banking-influenced criteria for assigning rankings to particular stocks, and not the objective criteria that Morgan Stanley claimed it was using." The statements regarding Morgan Stanley's compliance with NYSE and NASD regulations were likewise misleading, in Shah's view, because Morgan Stanley analysts violated these regulations by issuing ratings that were not objective.

Finally, the alleged improper practices "if discovered, threatened to erode public, client and investor confidence in Morgan Stanley and to expose Morgan Stanley to substantial liability from government and regulatory authorities and private litigants."

## DISCUSSION

Reviewing a motion to dismiss, we accept as true all factual allegations in the complaint and construe all reasonable inferences in the non-movant's favor. *See Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir.1999). We review *de novo* a district court's decision to grant a motion to dismiss. *See Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998). "Where inquiry notice is clearly established, dismissal of a securities-fraud complaint as untimely may be readily affirmed." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir.2005) (internal citation omitted), *cert. denied,* —— U.S. ——, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005) (Mem.). Because we affirm the dismissal of Shah's complaint on the ground that it was time-barred, we address only that issue.

■ Under Section 10(b) of the Securities and Exchange Act of 1934, claims of securities fraud must be "brought within one year after the discovery of the facts constituting the violation." 15 U.S.C. § 78i(e). The Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 804(a), 116 Stat.

745, 801 (2002) (codified at 28 U.S.C. § 1658), extended the limitations period to two years, but applies only to fraud claims arising on or after the effective date of the Act—July 30, 2002—and does not revive claims that were already time-barred under the prior one-year limitations period. *See In re Enterprise Mortgage Acceptance Co.,* 391 F.3d 401, 411 (2d Cir.2004).[3]

■ The limitations period begins to run when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992). "Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate." *Lentell,* 396 F.3d at 169.

Information contained in articles in the financial press may trigger the duty to investigate. *See, e.g., LC Capital Partners v. Frontier Ins. Group,* 318 F.3d 148, 155 (2d Cir.2003) (affirming dismissal because one press article and one lawsuit triggered inquiry notice); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 272 F.Supp.2d at 265 (finding plaintiff was on inquiry notice based on news articles); *In re Ultrafem Inc. Sec. Litig.,* 91 F.Supp.2d 678, 692–93 (S.D.N.Y.2000) (dismissing complaint as time-barred because one article and one public filing triggered inquiry notice). Such a duty arises "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Dodds v. Cigna Secs.,* 12 F.3d 346, 350 (2d Cir.1993); *see also Newman v. Warnaco Group,* 335 F.3d 187, 193 (2d Cir.2003) ("The [existence of] fraud must be probable, not merely possible.").

■ "If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." *LC Capital Partners,* 318 F.3d at 154. If, on the other hand, "some inquiry is made, we will impute knowledge of what an investor in the exercise of reasonable diligence[ ] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." *Lentell,* 396 F.3d at 168 (internal quotation marks omitted) (modification in original). Thus, "whether the securities fraud claim of a plaintiff who receives storm warnings is time barred turns on *when,* after obtaining inquiry notice, the plaintiff in the exercise of reasonable diligence, should have discovered the facts underlying the [defendant's] alleged fraud." *Levitt v. Bear Stearns & Co.,* 340 F.3d 94, 101 (2d Cir. 2003) (internal quotation marks omitted).

■ In concluding that Shah's claims were time-barred, the district court found that "plaintiff was on inquiry notice of the alleged fraud no later than May 14, 2001, the date of *Fortune* magazine's feature article about Morgan Stanley and Meeker. Since plaintiff does not allege that he undertook any inquiry after that date, knowledge of the alleged fraud is imputed to plaintiff as of May 14, 2001, and accordingly his complaint is untimely." *Shah,* 2004 WL 2346716, at *8. We agree.

Whether previous warnings may have been sufficient to trigger inquiry notice is

---

**3.** The district court issued its opinion before we decided *In re Enterprise Mortgage Acceptance Co.,* 391 F.3d 401 (2d Cir.2004), in which we held that the two-year statute of limitations under the Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 804(a) (codified at 28 U.S.C. § 1658), does not revive claims that were already time-barred by July 30, 2002, the effective date of that Act. *Id.* at 411. Accordingly, the district court assumed that the longer limitations period applied and nevertheless found that the claims were time-barred. *See Shah v. Stanley,* No. 03 Civ. 8761, 2004 WL 2346716, at *8 (S.D.N.Y. Oct.19, 2004).

a question we need not decide. The May 14, 2001 *Fortune* magazine article certainly "would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Dodds*, 12 F.3d at 350. The very subtitle of the article encapsulates the alleged conflict of interest that is at the heart of Shah's complaint: "[Mary Meeker] may be the greatest dealmaker around. The problem is, she's supposed to be an analyst." Elkind, *supra*, at 68, 69. By the end of its first few paragraphs, the article sets forth more specifically Meeker's lack of objectivity and independence with respect to her stock analysis:

> Meeker ... has become ... the single most powerful symbol of how Wall Street can lead investors astray. For the past year, as Internet stocks have crumbled and entire companies have vaporized, Meeker has maintained the same upbeat ratings on her companies that characterized her research reports in the glory days. For instance, of the 15 stocks Meeker currently covers, she has a strong buy or an outperform rating on all but two. Among the stocks she has never downgraded are Priceline, Amazon, Yahoo, and FreeMarkets—all of which have declined between 85% and 97% from their peak. For this she has been duly pummeled in the press, accused of cheerleading for Morgan Stanley's investment banking clients.

*Id.* at 70.

The four improper business practices Shah identified in his complaint[4] were all discussed in the *Fortune* article:

The modern analyst helps the banking team smoke out promising companies, sits in on strategy sessions, and promises—implicitly at least—to "support" the company once it has gone public with favorable research. That this makes tough-minded, independent stock research difficult, if not impossible, is no longer even an issue at most firms; investment banking brings in far more money than, say, brokerage commissions from grateful investors, thankful for unbiased research. Indeed, these days most analysts' pay is directly linked to the number of banking deals they're involved in.

*Id.* at 76.

The article did not report the mere existence of a conflict of interest. *Cf. Fogarazzo*, 341 F.Supp.2d at 300 ("While such reports [generally describing conflicts] indicate a tension ..., they do not suggest the widespread fraud alleged here—they only provide the background."). Rather, it described in great detail how Meeker's divided loyalties in fact affected her analytical reports:

> The essential charge that has been hurled at [Meeker] this past year centers on her refusal to downgrade her stocks, even as they dropped 70%, 80%, more than 90% in some cases. In effect she's being accused of selling out investors to keep Morgan Stanley's banking clients happy. In the *New York Times* last December, Gretchen Morgenson noted that Meeker had an outperform rating on all of her Internet stocks—

4. These were: (1) tying research analysts' compensation to Morgan Stanley's investment banking business, (2) offering companies favorable research coverage in order to gain their investment banking business, (3) initiating or terminating research coverage and rating stocks based on prospects of attracting investment banking business, and (4) a general failure to establish adequate procedures to protect research analysts from conflicts of interest.

down an average of 83%—and pointedly asked a Morgan Stanley PR official whether "her nonstop optimism had anything to do with the fact that most of the companies had engaged Morgan Stanley as an investment bank."

Elkind, *supra,* at 82.

In addition, the article included a specific example of how Meeker used her research coverage as a "carrot" to gain investment banking business. *Id.* at 76. After Meeker's poor performance in a presentation led eBay to select Goldman Sachs, rather than Morgan Stanley, to handle its IPO, Meeker—in her own words—"flipped into overdrive." *Id.* After the rejection but before the eBay IPO, Meeker personally courted eBay's CEO and "held out a carrot no other firm could proffer: a Mary Meeker research report." *Id.* Meeker handed the CEO "a draft of a glowing report on the company," which Meeker published—along with an "outperform" rating—on the first day of trading. *Id.* "Seven months later, when the company did a $1.1 billion secondary stock offering, eBay forced Goldman to split the business with Morgan Stanley." *Id.*

Because of the degree of specificity with which it described the alleged conflicts of interest at the heart of Shah's complaint, the *Fortune* article stands in stark contrast to the "generic articles on the subject of structural conflicts" that we previously have held to be insufficient to trigger inquiry notice. *Lentell,* 396 F.3d at 170.

The distinguishing characteristic of Shah's suit—that it is brought against Morgan Stanley by its own stockholders, not holders of the stocks Morgan Stanley rated—must be considered in reviewing the articles cited. Where the nature of a plaintiff's complaint is that the defendant's false and misleading statements inflated the prices of securities other than the defendant's own stock, the plaintiff must "al-

lege facts specific to the security in question, including who said what to whom concerning that particular security." *Id.* at 169 (internal quotation marks and emphasis omitted). Thus, in *Lentell,* a suit against Merrill Lynch by holders of stock in two companies, "articles cited by the district court [that] strongly suggest grounds to believe that certain investment recommendations were less than candid," but in which "neither company is mentioned," cannot put the holders of unmentioned companies on inquiry notice that those companies were the subject of unobjective ratings. *Id.* at 171. In the instant suit, by contrast, the reports triggering a duty to investigate are not limited to those mentioning specific corporations whose stocks were overrated. An article specifically describing the business practices *at Morgan Stanley* that serve as the basis of Shah's complaint as a holder of stock *in Morgan Stanley* must be regarded as a "storm warning" of the fraud alleged. *Id.* at 169.

Because Shah was on inquiry notice of Morgan Stanley's alleged fraud by at least May 14, 2001 and made no investigation once his duty to do so arose, the district court properly imputed knowledge of the alleged fraud to Shah as of that date. *See Shah,* 2004 WL 2346716 at *8; *Lentell,* 396 F.3d at 168. Thus, under the one-year statute of limitations, Shah's claims expired on May 15, 2002, *see* 15 U.S.C. § 78i(e), and are not revived by the subsequent passage of the Sarbanes–Oxley Act, *see In re Enterprise Mortgage Acceptance Co.,* 391 F.3d at 411.

Shah contends that even if his claims arising from purchases of Morgan Stanley stock before July 30, 2001 are time-barred, his claims arising out of stock purchases made on or after that date cannot be. These claims, he argues, were not time-barred by the effective date of the

Sarbanes–Oxley Act, July 30, 2002, because they were then no more than one year old. Thus, the argument continues, such claims are subject to Sarbanes–Oxley's two-year statute of limitations, and therefore were timely filed on July 18, 2003. We disagree.

Because Shah was on inquiry notice of Morgan Stanley's allegedly fraudulent practices as of May 14, 2001, he cannot succeed with a separate fraud claim for stock purchases made after that date; it was unreasonable after May 2001 to rely on the market price of Morgan Stanley stock. *See Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275, 282 (2d Cir.1975) ("[I]f the plaintiff has been furnished with the means of knowledge and he is not prevented from using them he cannot say that he has been deceived by the misrepresentations of the other party.").

In light of our holding, we need not consider appellees' argument that the district court's judgment may be affirmed on the alternative ground that Shah failed to state a claim for securities fraud under the requirements of the PSLRA, 15 U.S.C. § 78u–4(b), and Federal Rule of Civil Procedure 9(b).

## CONCLUSION

For the reasons just stated, we affirm.