**Steve STAEHR, Individually and On Behalf of All Others Similarly Situated, Plaintiffs,**

v.

**The HARTFORD FINANCIAL SERVICES GROUP, INC., et al., Defendants.**

**No. 3:04CV1740 (CFD).**

United States District Court, D. Connecticut.

July 13, 2006.

David Randell Scott, Erin Green Comite, Scott & Scott, Colchester, CT, Debra Wyman, Tor Gronborg, Udoka Nwanna, Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, CA, James E. Miller, Patrick A. Klingman, Sheperd Finkelman Miller & Shah, Chester, CT, Elias A. Alexiades, New Haven, CT, Shane Rowley, Faruqi & Faruqi, Llp, New York City, for Plaintiffs.

Jack C. Auspitz, Jamie A. Levitt, John W.R. Murray, Morrison & Foerster, New York City, Timothy Andrew Diemand, Wiggin & Dana–Htfd., Hartford, CT, Timothy Diemand, Wiggin and Dana, New Haven, CT, for Defendants.

### RULING GRANTING MOTION TO DISMISS

DRONEY, District Judge.

The lead plaintiffs, Communications Workers of America Plan for Employees' Pensions and Death Benefits and Alaska Laborers Employers Retirement Fund, brought this putative class action against The Hartford Financial Services Group, Inc. ("The Hartford"), and four senior officers of The Hartford: Ramani Ayer, David M. Johnson, Thomas M. Marra and David K. Zwiener. The lead plaintiffs allege that they and other class members purchased the publicly-traded securities of The Hartford between August 6, 2003 and October 13, 2004. The consolidated amended complaint ("complaint") alleges that the defendants failed to disclose The Hartford's participation in "insurer-broker contingent commission and bid-rigging schemes" thereby misleading investors and the market about the basis for The Hartford's business performance. The action is brought pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5. The defendants now move to dismiss this action on various grounds.[1] For the reasons that follow, the motion is GRANTED.

### FACTS

For the purposes of deciding this motion, the court assumes that the following allegations contained in the complaint are true.

The Hartford is one of the largest insurers in the property-casualty and life insurance industries. Through its subsidiaries, The Hartford sells investment products and insurance to both individuals and businesses. The individual defendants are all senior officers of The Hartford.

Commercial brokers operate between insurance companies such as The Hartford and their policy holders. The brokers are hired by clients to assist in the purchase of insurance products, including soliciting price quotes and recommending particular insurers.

Some years ago, the insurance brokerage industry underwent a period of intense consolidation so that by 2003, more than 70% of the market was controlled by two brokers: Marsh, Inc. ("Marsh") and Aon

1. The motion is filed in the lead docket no. 3:04–CV–1740(CFD) but applies also to docket no. 3:04–CV–1764(CFD).

Corporation ("Aon"). The plaintiffs allege that The Hartford entered into contingent commission kickback arrangements with Marsh, Aon and Willis Group, the third largest broker, to control market share and artificially inflate insurance prices. The Hartford would pay the brokers undisclosed fees based on the volume of the premiums generated by the brokers, the growth of business and renewal of business, and the profitability of the book of business purchased by the brokers' clients.

The contingent commission kickback arrangements were memorialized in "placement service agreements" or "market service agreements" between The Hartford and the brokers. It is also alleged that these agreements were negotiated and executed at the senior corporate level and bound The Hartford to make undisclosed payments that could exceed $150 million per year. The agreements altered the market for insurance by motivating brokers to serve the interests of select insurers rather than clients and by eliminating natural market price controls.

The Hartford, as well as other insurers, also allegedly colluded with brokers to manipulate the bidding process, thereby eliminating competition and artificially inflating the price.

The complaint states that the defendants failed to disclose The Hartford's participation in the contingent commission and bid-rigging schemes, thereby misleading investors and the market about the basis for its business performance. Additionally, the defendants violated generally accepted accounting principles ("GAAP") by failing to properly report, disclose and account for the contingent commissions in the financial statements filed with the SEC for the second, third and fourth quarters of 2003 and the first and second quarter of 2004.

Between November of 2003 and September of 2004, the individual defendants sold in excess of $37 million worth of their personal holdings in The Hartford.

In summary, Count 1 of the complaint alleges that The Hartford and the individual defendants violated Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder by engaging in undisclosed contingent commission and bid-rigging schemes with insurance brokers for the purposes of maintaining artificially high market prices for The Hartford's publicly traded securities. Count 2 alleges that the individual defendants also violated Section 20(a) of the 1934 Act because they acted as "controlling persons" of The Hartford within the meaning of the Act.

### STANDARD OF REVIEW

When considering a Rule 12(b) motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003). In its review of a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993). Dismissal is inappropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000). " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *York v. Ass'n of the Bar,* 286 F.3d 122, 125 (2d

Cir.) (quoting *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683), cert. denied, 537 U.S. 1089, 123 S.Ct. 702, 154 L.Ed.2d 633 (2002). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir.2004) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss" from being granted. *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir.2002) (internal quotation marks and citation omitted).

## DISCUSSION

The defendants move to dismiss the complaint on five grounds: (1) the plaintiffs' claims are barred by the statute of limitations; (2) the plaintiffs cannot establish that the alleged omissions were material because the information was publicly known and available prior to the class period; (3) the plaintiffs cannot establish that any loss was caused by the defendants; (4) the complaint fails to allege scienter; and (5) the plaintiffs cannot establish control person liability against any of the defendants.

### 1. *Statute of Limitations*

The defendants contend that The Hartford's payments of contingent commissions to insurance agents have been published in the news media and disclosed in state and federal filings, as well as in four lawsuits. Accompanying their motion to dismiss, the defendants have attached 33 exhibits that purport to illustrate the news coverage and disclosure, and ask that the court take judicial notice of the material. They argue that this publicity and disclosure put the plaintiffs on inquiry notice by no later than July 2001. As the statute of limitations for the plaintiffs' claims is two years, and this action was not commenced until October 2004, the defendants conclude that the claims are time-barred.

The plaintiffs argue by way of a separate motion to strike, that the court, in deciding a motion to dismiss, must limit itself to facts stated in the complaint, documents attached to the complaint and documents incorporated by reference in the complaint. As the exhibits presented by the defendants are not referred to by the complaint in any way, the court should not consider them. The plaintiffs further respond that if the court should decide to consider the exhibits, it must convert the motion to dismiss into a motion for summary judgment to give them the opportunity to do discovery on the issue. Finally, the plaintiffs argue that even if the court should decide to consider the exhibits on the motion to dismiss, they are insufficient for the court to find that the plaintiffs were put on inquiry notice.

### A. *Judicial notice*

■ The Second Circuit has stated that "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." *LC Capital Partners, L.P. v. Frontier Ins. Group*, 318 F.3d 148, 156 (2d Cir.2003)(internal quotation marks and citation omitted). Nevertheless, "[w]here ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers ... integral to the complaint, resolution of the issue on a motion to dismiss is appropriate, [ ] and we have done so in a vast number of cases." *Id.* (internal quotation marks and citations omitted). In the plaintiffs' view, *LC Capital Partners*

stands for the proposition that inquiry notice can be determined as a matter of law *only* where the required facts "can be gleaned from the complaint and papers . . . integral to the complaint." *Id.*

■ There is, however, a line of cases holding that a district court may rely on papers outside the complaint when resolving an issue of inquiry notice on a motion to dismiss under Rule 12(b)(6). In *Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir.1991), the Second Circuit stated that "[i]n considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. Of course, *it may also consider matters of which judicial notice may be taken under Fed.R.Evid. 201.*" *Id.* at 773 (emphasis added). In *Kramer*, the court of appeals affirmed the lower court's dismissal of a securities action holding that "a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC" under Fed.R.Evid. 201(b)(2). *Id.* at 774. *See also Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991)("[W]hen a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these public documents.")

In *White v. H & R Block, Inc.*, 2004 WL 1698628, 2004 U.S. Dist. LEXIS 14522 (S.D.N.Y.2004), the district court took judicial notice of a number of press articles when granting a motion to dismiss on the ground that the plaintiffs were put on inquiry notice more than two years before they sued. It reasoned that "[w]hile the court cannot take judicial notice of these articles for the truth of the reports, the court can-and does-take judicial notice that the reports were made . . . which is all that is necessary to trigger inquiry notice." *White*, 2004 WL 1698628 at *6 n. 2, 2004 U.S. Dist. LEXIS at *18, n. 2 (citing *Kramer*, 937 F.2d at 773). Furthermore, in *Shah v. Morgan Stanley*, 2004 WL 2346716, 2004 U.S. Dist. LEXIS 20897 (S.D.N.Y.2004), the district court, relying on news articles and complaints filed in state courts, granted a motion to dismiss after finding that the plaintiff's claims were time-barred because the plaintiff was on inquiry notice of the alleged fraud. Citing *White*, the court noted that it took "judicial notice, as permitted under Fed.R.Evid. 201, of certain publications and publicly filed pleadings not cited in the complaint." *Shah*, 2004 WL 2346716 at *2, 2004 U.S. Dist. LEXIS 20897 at *5. The Second Circuit recently affirmed the district court's decision, relying explicitly on one of the news articles of which the district court had taken judicial notice. *Shah v. Meeker*, 435 F.3d 244, 250 (2d Cir.2006).[2] *See also Samuels*, 992 F.2d at 15.

In light of the line of cases originating with *Kramer* and the Second Circuit's recent holding in *Shah*, the court does not view the Second Circuit's holding in *LC Capital Partners* as a general prohibition

---

**2.** As both parties note, this court has previously taken judicial notice of documents filed in other courts when deciding a motion to dismiss. *Browdy v. Karpe*, 2004 WL 2203464, 2004 U.S. Dist. LEXIS 19299 (D.Conn.2004). Taking judicial notice of the judgment mittimus and the transcript of the plea and sentencing in [the defendant's] state criminal case, the court noted that " 'courts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish as the fact of such litigation and related filings.' " *Id.* at 2004 WL 2203464 *3 n. 3, 2004 U.S. Dist. LEXIS 19299 *5 n. 3 (quoting *Kramer*, 937 F.2d at 774).

on district courts taking judicial notice of documents for the purpose of determining whether a plaintiff was put on inquiry notice.

For the court to take judicial notice of an adjudicative fact, it must be "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2). The plaintiffs submit that they question the authenticity of the defendants' exhibits and argue that because the defendants have not offered support for their assertion of authenticity, judicial notice is improper. However, on December 20, 2005, Jamie A. Levitt, counsel for the defendants, submitted an affidavit declaring that the documents that constitute exhibits 1–33 are authentic. The affidavit also states where all but two of the exhibits (number 29 and 30) were obtained.[3] For example, the copies of news articles that constitute exhibits 12–28, and that the plaintiffs characterize as coming from "obscure insurance industry publications," are, with the exception of exhibit 28, available on Lexis/Nexis. Exhibit 28, an article from the March 1999 issue of *Canadian Underwriter,* is available at that magazine's website.[4]

The list of exhibits offered by the defendants contain copies of:

- Four complaints filed in state court in California and Illinois (Ex. 1–4).
- Three press releases (Ex. 5, 11, 32).
- Four regulatory filings by The Hartford (Ex. 6, 29, 30, 33). Nineteen articles from various publications (Ex. 7, 9, 12–28).
- Two charts showing the trading history for The Hartford stock during various periods (Ex. 8, 10).

- One transcript of portions of a conference call between officers of The Hartford and analysts (Ex. 31).

Having reviewed the listed documents and their sources, the court finds that they satisfy the requirements of Fed.R.Evid. 201(b)(2) and will therefore take judicial notice of those documents. The court notes, however, that it does not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters have been publicly asserted.

### B. *Conversion to summary judgment*

The plaintiffs next argue that if the court decides to consider the defendants' exhibits, it must convert the motion to dismiss into one for summary judgment.

Under Fed. R. Civ. Pro. 12(b)(7), if, on a 12(b)(6) motion to dismiss, "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . ." However, for the purposes of conversion, matters of which the district court can take judicial notice are not considered matters outside the pleadings. *Samuels,* 992 F.2d at 15 (In its review of a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."); Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1366 at 183–5 (3d ed. 2004)("[M]atters of which the district court can take judicial notice" are "not considered matters outside the pleadings for purposes of conversion.") The court therefore declines to convert the motion to dismiss into one for summary judgment.

---

**3.** The plaintiffs have not objected or otherwise responded to the affidavit.

**4.** http://www.cdnunderwriter.com/issues/ ISarticle.asp?id=37412 & story—id=57 840 & issue=03011999

### C. *Inquiry notice*

■ Turning to the substance of the statute of limitations issue, the parties agree that the applicable statutes of limitations period is two years after the plaintiff is put on inquiry notice of the fraud. The court concurs. *See* 28 U.S.C. § 1658(b)(1).

"[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir. 1993). "Such circumstances are often analogized to 'storm warnings.'" *Id.* (citing *Cook v. Avien, Inc.,* 573 F.2d 685, 697 (1st Cir.1978)).

■ "In assessing whether a plaintiff should have been put on inquiry notice, courts generally examine whether any financial, legal, or other data, including public disclosures in the media about the financial condition of the corporation, available to the plaintiff trigger sufficient warnings to alert a reasonable investor of the probability of fraud." *Great S. Life Ins. Co. v. Enter. Mortg. Acceptance Co., LLC (In re Enter. Mortg. Acceptance Co., LLC, Sec. Litig.),* 295 F.Supp.2d 307, 311 (S.D.N.Y.2003)(citing *Newman,* 335 F.3d at 193; *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,* 2003 WL 21088506, 2003 U.S. Dist. LEXIS 8065 (S.D.N.Y. May 14, 2003)). The defendants' exhibits that are relevant to inquiry notice can be categorized as follows: (i) Earlier lawsuits, (ii) press accounts, and (iii) regulatory filings.

### i. *Earlier lawsuits*

In 1999 and 2001, two lawsuits, *Turner v. AON Corp. et al.* ("Turner I") and *Turner v. The Hartford Fire Ins. Co. et al.* ("Turner II"), were filed in the Superior Court of California. During 2000, two more suits, *Village of Orlando Hills v.* *Arthur J. Gallagher & Co.* and *Daniel v. AON Corp.,* were filed in Illinois state court.

In Turner I, the plaintiff, Scott C. Turner, sued Aon, Marsh, Willis Group and other insurance brokers, alleging that without their clients' knowledge, "since at least 1986 the defendants entered into agreements with a number of insurance companies whereby the defendant were paid commission or fees based upon the amount of business produced by the defendants...." (Ex. 1, par. 23). The complaint termed these agreements "undisclosed agency contracts" and alleged that "The Hartford Insurance Group" was among the insurance companies that had such contracts with the brokers. (Ex. 1, par. 24)

In Turner II, the same plaintiff sued a number of insurance companies including Hartford Fire Insurance Company, Hartford Accident & Indemnity Company and several other of The Hartford's subsidiaries. The complaint alleged that the defendants have for decades "paid ... contingent fees and/or commissions" to insurance brokers "without disclosure." (Ex. 2, par. 25, 26). These undisclosed fees and commissions "constitute undisclosed kickbacks to brokers of premiums paid to defendants by policyholders." (Ex. 2, par. 27).

The two suits filed in Illinois both name insurance brokers as defendants and allege the same undisclosed "kickbacks" or "contingent fees or commissions" as in the two California suits. However, neither The Hartford nor its subsidiaries are specifically mentioned in the Illinois suits.

### ii. *Press accounts*

The defendants have provided eleven articles from between 1997 and 2000 that all discuss the contingent commission agreements between insurance brokers and insurance companies. (Ex. 18–28). The articles are from The New York Times, The

Financial Times and from the trade journals Business Insurance and National Underwriter.

The New York Times article appeared on February 14, 1999. It explains that while the customers of insurance brokers assume that the brokers serve their interests, "for years, brokers have also been quietly receiving incentive payments on the other end of the deal, from some of the very insurance companies that, according to custom and law, they are supposed to be dispassionately scrutinizing on their customers' behalf. The existence of these payments, called contingency fees, and the extent to which they should be disclosed, have become hot topics in the commercial insurance business in the United States, Canada and Britain." Joseph B. Treaster, *Insurers Pay the Brokers, Making Customers Wary,* The New York Times, February 14, 1999. The article further states that "[t]he rapid consolidation of the brokerage industry is making contingency fees even more controversial." *Id.* It singles out Marsh and Aon as the two "giant brokers" that "dominate the field." The article goes on to explain the contingency fees and states that "[t]hough some insurers do not pay contingency fees, many others consider them a necessary tool for making sure they get a slice of the pie." *Id.* The ten other articles discuss the contingency fees in various detail. Most name the brokers Marsh and Aon and report on efforts to have the brokers disclose the contingency fees to their clients. An article in Business Insurance reports that J & H Marsh & McLennan Inc., Marsh's parent company, agreed to "disclose contingent commission revenue when requested by risk managers. . . ." Michael Bradford, *RIMS, Brokers in Deal to Reveal Commissions,* Business Insurance, February 1, 1999. It further reports that the company had conducted a client survey which showed that 3% of its clients "consider contingent commissions a 'critical issue' . . . [and] 17% felt the issue was 'of concern'. . . ." *Id.* Finally, the article reports that Aon's president and CEO stated that the company would not adopt the same policy as Marsh as it has "been living and practicing that approach from day one." *Id.*

The defendants also point to four articles in the National Underwriter from 2000 that discuss the Turner I lawsuit. (Ex. 12–16). One of these, "Brokers Sued Over Contingency Fees; Attorney Alleges Deception of Buyers," reports that the complaint alleges that the contingency fee contracts were made with The Hartford Insurance Group among other insurance companies. (Ex. 12). Another is an editorial comment which states that "[National Underwriter] has taken brokers to task a number of times for the way in which contingency fees have been kept from policyholders. We argued that a lack of disclosure creates the appearance of impropriety and raises the possibility of conflict of interest." Editorial Comment, *Lawsuit Might be Deathblow to Contingency–Fee System,* National Underwriter, February 28, 2000.

iii. *Regulatory filings*

The defendants finally argue that, since 1998, they have disclosed the contingent commissions The Hartford was paying to insurance brokers. The first disclosure occurred in the publicly available Insurance Expense Exhibits that The Hartford files annually for each of its insurance subsidiaries in every state in which the subsidiaries are domiciled. Under the heading "Commission and brokerage," this filing lists the amounts of "contingent commissions" paid to brokers. (Ex. 29). The second disclosure of the payment of contingent commissions occurred in The Hartford's Form 10–K for 2000, which was filed

with the SEC on March 23, 2001.[5] (Exh. 30). The defendants assert that under the heading "Significant Accounting Policies," it reads that: "Retrospective and contingent commissions and other related expenses are incurred and recorded in the same period that the retrospective premiums are recorded or other contract provisions are met."[6]

There is no doubt that the lawsuits and press accounts clearly spelled out the existence of contingent commission kickback schemes between insurance companies and brokers. Significantly, they also announced that these schemes were industry-wide. A number of the press accounts state that the brokerage industry had been consolidating and that the large majority of the business was controlled by Marsh and Aon. With two or three companies controlling the brokerage industry, they effectively act as a funnel through which much of the insurance business must pass. The obvious inference has to be that whatever practice the brokerage companies employ as to some insurance companies (and here the relevant practice is the contingent commissions) they employ as to most or all of the insurance companies. And in fact the New York Times article reported that "though some insurers do not pay contingency fees, many others consider them a necessary tool for making sure they get a slice of the pie." (Ex. 18). That The Hartford could be implicated is especially likely given, as the complaint points out, that it is one of the largest insurers in the property-casualty and life insurance industries. Furthermore, "[t]he court presumes that [ ] highly publicized, industry-wide information [is] known to the plaintiffs...." *Blue Cross v. Smithkline Beecham Clini-*cal *Lab., Inc.,* 108 F.Supp.2d 116 (D.Conn.2000)(citing *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F.Supp. 620, 640 (S.D.N.Y.1993) ("sophisticated investors legally may be presumed to know of information in the public domain, such as newspapers and magazine articles."); *Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir. 1978) (plaintiff shareholders presumed to know information in public domain); *Bibeault v. Advanced Health Corp.,* 1999 WL 301691, at *4–5, 1999 U.S. Dist. LEXIS 7173, at *12 (S.D.N.Y. May 12, 1999) ("when the facts giving rise to a fraud action are in the public domain, courts regularly impute constructive knowledge to the plaintiffs for the purpose of triggering the statute of limitations.")) *See also Shah,* 435 F.3d at 249 ("Information contained in articles in the financial press may trigger the duty to investigate").

The four lawsuits also detail the payment of contingency fees. Turner II names various insurance companies as defendants, including subsidiaries of The Hartford such as Hartford Fire Insurance Company, Hartford Accident & Indemnity Company and several others, and alleges that they have paid millions of dollars in undisclosed fees and commission to insurance brokers. *See LC Capital Partners,* 318 F.3d at 155 (An earlier lawsuit contributed to the storm warnings that placed the plaintiffs on inquiry notice).

█ The plaintiffs offer two general arguments as to why the news articles, lawsuits and regulatory filings are insufficient to have placed them on inquiry notice. They first contend that not all of the fraudulent activities they allege in the

---

**5.** Form 10–K is an annual report that provides a comprehensive overview of the company's business and financial condition and includes audited financial statements.

**6.** In the two-page copy that constitutes exhibit 30, the court cannot find the heading described by the defendants. However, the sentence does appear twice under the heading "(J) REVENUE RECOGNITION."

complaint are disclosed in the previous lawsuits and news accounts and that they cannot have been placed on notice as to these activities. In particular, the allegations of bid-rigging activities, violation of GAAP standards and the misleading of The Hartford's investors are not reported. However, "[a]n investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds,* 12 F.3d at 352. Furthermore, it is clearly the contingent commission kickback schemes that are the central focus of the plaintiffs' complaint. The alleged violation of GAAP standards and the misleading of investors both concern the alleged failure to disclose these schemes. Therefore, while the bid-rigging activities that are alleged in the complaint may not appeared in public papers, there was clearly enough information available to place the plaintiffs on notice of the large majority of the fraud they allege.

Citing *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 169 (2d Cir.2005), the plaintiffs further argue that the public documents did not put them on notice because they do not specifically discuss The Hartford and therefore fail to be company-specific. "Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate." *Id.* The court is not persuaded by the plaintiffs' argument. First, Turner I and Turner II do make direct mention of The Hartford and its subsidiaries. In addition, the February 14, 2000 article in the National Underwriter that reported on Turner I, repeats the claim that the Hartford Insurance Group had contingency fee contracts. Furthermore, to the extent the plaintiffs are arguing that *Lentell* stands for the proposition that *only* company-specific information can constitute a storm warning, the court disagrees with the plaintiffs' reading of that case. As already noted, the notice standard is as follows: "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Dodds,* 12 F.3d at 350. Indeed, in *Lentell* the Second Circuit went on to state that "[w]e do not mean to suggest that inquiry notice could never be established on the basis of non-specific public-pronouncements, but [ ] inquiry notice can be established only where the triggering data 'relates directly to the misrepresentations and omissions' alleged." *Lentell,* 396 F.3d at 171 (quoting *Newman,* 335 F.3d at 193). Thus while company-specific information of the kind contemplated in *Lentell* constitutes a storm warning, information that is not so company-specific may also suffice for a court to find that the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.

■ That is the case here. The court finds that the "cumulative effect" of the publicly available documents should have suggested to a reasonable investor of ordinary intelligence that The Hartford was likely one of the insurance companies paying contingent commissions to the insurance brokers. *Blue Cross,* 108 F.Supp.2d at 116. In other words, the publicly available information darkened the sky and increased the winds sufficiently to constitute a storm warning. The plaintiffs are therefore charged with constructive notice of the alleged fraud by July 2001, the time the last of the four lawsuits was filed. "The duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the investor undertakes some inquiry. If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the investor makes some inquiry once the duty arises, we will impute knowledge of

what an investor in the exercise of reasonable diligence, should have discovered concerning the fraud and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." *LC Capital Partners*, 318 F.3d at 154 (internal citations and quotation marks omitted). Here the plaintiffs have not alleged that they undertook any inquiry after July 2001 and knowledge of the alleged fraud is therefore imputed to the them as of that time. This action was not commenced until October 2004 and the two-year statute of limitations has therefore run. Consequently, the defendants' motion to dismiss is GRANTED.

As the motion to dismiss is granted because the statute of limitations has run, the court need not resolve the other grounds for dismissal asserted by the defendants.

## CONCLUSION

For the reasons stated above, the motion to dismiss (document no. 49) is GRANTED.