06-3877-cv
Staehr v. The Hartford Financial Services Group, Inc.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007

_____

(Argued:  June 19, 2008                    Decided: November 17, 2008)

Docket No. 06-3877-cv

_____

**STEVE STAEHR**, on behalf of all others similarly Situated,
Alaska Laborers Employers Retirement Fund and The
Communication Workers of America Plan for Employees'
Pensions and Death Benefits,

*Plaintiffs-Appellants,*

Kevin Montoya, Individually and on Behalf of All Others
Similarly Situated, Philip Stampfel, on behalf of Hartford
Financial Services Group Inc.,

*Consolidated-Plaintiffs*,

David Wexler, d/o/b Hartford Financial Services Group Inc.,

*Consolidated-Plaintiff-Appellant*,

– v. –

**THE HARTFORD FINANCIAL SERVICES GROUP, INC.**,
Thomas M. Marra, Ramani Ayer, David K. Zwiener and
David M. Johnson,

*Defendants-Appellees*,

Edward J. Kelly III, Paul G. Kirk, Jr., Gail J. McGovern,
Robert W. Selander, Charles B. Strauss, H. Patrick Swygert,
Gordon I. Ulmer, Ronald E. Ferguson, Rand V. Araskog, Donald
R. Frahm, and Robert J. Price,

*Consolidated-Defendants-Appellees*.

————————————————————————————————x

William S. Lerach
Eric Alan Isaac
Tor Gronborg
Debra Wyman
Tami Falkenstein Hennick,
LERACH COUGHLIN STOIA GELLER RUDMAN ROBBINS LLP
*Counsel for Appellants*

David R. Scott
Erin Green Comite
SCOTT & SCOTT LLP
*Counsel for Appellants*

Jack C. Auspitz,
Jamie A. Levitt
John W.R. Murray
MORRISON & FORRESTER LLP
*Counsel for Appellees*

Timothy A. Diemand
WIGGIN & DANA LLP
*Counsel for Appellees*


BEFORE:     HON. PETER W. HALL,
            HON. DEBRA ANN LIVINGSTON,
                        *Circuit Judges*,
            HON. COLLEEN MCMAHON,
                        *District Judge*.[*]

---

[*] The Honorable Colleen McMahon, United States District Court Judge for the Southern District of New York, sitting by designation.

MCMAHON, *District Judge*:

This case is one of many stemming from the so-called "contingent commission" arrangements between insurers and brokers that were prevalent prior to October 2004. "Contingent commissions" is a euphemism for kickbacks— insurance brokers would receive payments from insurers for steering business their way.

Appellants purport to represent all persons who acquired common stock of The Hartford Financial Services Group, Inc. ("The Hartford") during the period of August 6, 2003 through October 13, 2004 (the "Class Period"). (Joint Appendix ("J.A.") at 2.) They bring this action against The Hartford and its senior officers (collectively, "Appellees"), alleging that investors acquired The Hartford's stock at prices that were artificially inflated due to Appellees' omissions, misrepresentations, and fraudulent concealment regarding kickbacks, bid rigging, and price manipulation schemes engaged in by insurers and brokers.

The District Court (Droney, *J.*) granted Appellees' motion to dismiss the complaint as barred by the statute of limitations. Taking judicial notice of materials that purportedly constituted "storm warnings" about The Hartford's alleged fraud, *see, e.g., Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir. 1993), the District Court concluded that Appellants were on inquiry notice of the fraud no later than July 25, 2001. Since the two-year statute of limitations began to run on that date, it expired in July 2003— more than a year before the suit was filed.

We disagree with the District Court's conclusion that Appellants were on inquiry notice of their claims against The Hartford by July 25, 2001. Accordingly, we vacate the judgment and remand the case to the District Court for further proceedings.

1

## I.   BACKGROUND

### A

The Hartford is a large insurer in the property-casualty and life insurance industries. Through its subsidiaries, The Hartford markets and sells investment products and insurance to individuals and businesses.

Commercial insurance brokers act as intermediaries between insurance companies and their policyholders. These brokers are hired by clients to assist them in soliciting price quotes, recommending insurers, and purchasing insurance products. After a period of consolidation in the insurance brokerage industry, Marsh, Inc. ("Marsh") and Aon Corporation ("Aon") emerged as the dominant brokers, controlling more than seventy percent of the market by 2003. (J.A. 11.)[1]

Appellants allege that The Hartford entered into contingent commission kickback arrangements with insurance brokers in order to increase The Hartford's market share and artificially inflate its insurance prices. According to Appellants, The Hartford paid brokers fees based on: the volume of the premiums the brokers steered to The Hartford; the growth and retention of business; and the profitability of the products purchased by the brokers' clients. (J.A. 11-14.)

The contingent commission/kickback arrangements, Appellants allege, were memorialized in "placement service agreements" or "market service agreements" between The Hartford and insurance brokers who steered business its way. These agreements allegedly bound

---

[1] Much of the factual background is based upon allegations in the Complaint. For purposes of evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court sets forth facts asserted in the Complaint and assumes their truth. *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 180 (2d Cir. 2008); *Shah v. Meeker*, 435 F.3d 244, 246 (2d Cir. 2006).

The Hartford to make payments that could amount to $150 million per year, creating a conflict of interest by motivating brokers to serve the interests of the insurers – with whom they had kickback arrangements – rather than to serve the interest of their clients. (J.A. 12-13.)

Insurers, including The Hartford, also allegedly engaged in "bid rigging" with insurance brokers, to eliminate competition and artificially inflate the price of insurance products.

Appellants contend that throughout the Class Period, The Hartford and its senior officers misled investors by failing to disclose The Hartford's participation in the insurer-broker contingent commission kickback and bid-rigging schemes. (J.A. 13-16.)

On October 14, 2004, the Office of the New York Attorney General ("NYAG") filed a lawsuit against Marsh detailing "the undisclosed commission pay-offs and bid-rigging schemes that a cartel of large insurers and insurance brokers were using to prop up their businesses and cause customers to purchase insurance at higher prices and less favorable terms than the market otherwise would have dictated." (J.A. 2-3.) The complaint cited The Hartford for its role in paying undisclosed contingent commissions and providing inflated bids. (J.A. 3.) The NYAG lawsuit, and The Hartford's purported involvement in the practices the lawsuit alleged, were the subject of widespread media attention; Eliot Spitzer, then Attorney General of New York, commented publicly that The Hartford was "involved in the scheme" and that "the corruption is remarkable." (J.A. 32.)

After the NYAG lawsuit was filed, The Hartford disclosed that it had paid $145 million in kickbacks to brokers in 2003 alone. It announced that it had ceased paying contingency commissions in the wake of the suit. (J.A. 32-33.)

3

The day after the NYAG announcement, Appellant Steve Staehr filed his original complaint in this action on behalf of a putative class of shareholders. Several similar complaints followed. (J.A. 819-35.)

On February 10, 2005, the District Court issued an order consolidating those complaints and appointing Alaska Laborers Employers Retirement Fund and the Communication Workers of America Plan for Employees' Pensions and Death Benefits as Co-Lead Plaintiffs. (J.A. 828.)

Appellants filed their Consolidated Amended Complaint on April 12, 2005 (the "Complaint"). On June 10, 2005, Appellees moved to dismiss the Complaint for failure to state a claim on multiple grounds, including (1) the statute of limitations had run; (2) Appellees' alleged omissions were immaterial; (3) loss causation could not be established; (4) the Complaint failed to allege scienter; and (5) Appellants could not establish control person liability against the individual defendants. *Staehr v. Hartford Fin. Svcs. Group, Inc., et al,* 460 F. Supp.2d 329 (D. Conn. 2006.) Appellees submitted various materials along with their motion to dismiss— materials that were not attached to or specifically referenced in the Complaint. These exhibits include various reports from the mainstream media and from insurance industry newsletters, complaints filed in four lawsuits, and filings made by The Hartford with state regulatory agencies. Appellees argue that, when viewed together, these exhibits illustrated the public nature of the alleged fraud and should have put Appellants on inquiry notice far earlier than two years prior to the commencement of this action.

Appellants opposed the motion and cross-moved to strike exhibits that were neither referenced in nor attached to the Complaint, or, alternatively, to convert the motion to dismiss into a motion for summary judgment. (J.A. 613-15, 630-77.)

On July 13, 2006, the District Court issued an opinion and order granting Appellees' motion to dismiss. *Staehr v. Hartford Fin. Svcs. Group, Inc.*, 460 F. Supp. 2d 329 (D. Conn. 2006). The District Court took judicial notice of the exhibits introduced into the record by Appellees pursuant to Federal Rule of Evidence 201. *Id.* at 334. The District Court emphasized that it did not take judicial notice of the documents for the truth of the matters asserted, and it denied Appellants' request to convert the motion to dismiss into a motion for summary judgment. *Id.* at 335. Addressing the merits of the motion, the District Court held that `Appellants' suit was time-barred by the applicable two-year statute of limitations. *Id.* at 340. The District Court found it unnecessary to rule on any of the other grounds for dismissal urged by Appellees. *Staehr*, 460 F. Supp.2d at 340.

Appellants timely filed their Notice of Appeal on August 17, 2006. (J.A. 814.)

**B**

The crux of Appellants' claims is that The Hartford's shareholders were misled because they believed they were investing in a company whose success (and concomitant high stock price) was premised on the strength of its business, when it was in fact the product of kickbacks and bid-rigging schemes that were not disclosed to investors. The Complaint alleges that Appellees' statements:

> failed to disclose that defendants had guaranteed tens of millions of dollars in commission-oriented kickbacks to insurance brokers . . . in exchange for these brokers illicitly steering business to Hartford and artificially inflating the premiums paid by insurance customers. [D]efendants were able to report earned premium growth and high premium renewal retention rates directly as a result of Hartford's involvement with the brokers in the commission kickbacks and bid-rigging schemes. (J.A. 16-17 (internal citations omitted).)

5

In other words, The Hartford's shareholders believed that The Hartford's success was premised on the company's unique business model and favorable market conditions, not on the company's participation in a conspiracy by insurers and brokers to manipulate the insurance industry and inflate the financial performance of its participants.

The bid-rigging scheme, according to Appellants, eliminated competition, artificially inflated the price of insurance, guaranteed higher earned premiums for The Hartford, produced larger kickbacks for the brokers, and resulted in high customer retention rates (which is an important measure of an insurance company's success). (J.A. 13-14.)  The pleading alleged that Appellees regularly released reports touting The Hartford's growth and business success without disclosing the role that kickbacks and bid rigging played in this success.  Instead, Appellees stated that The Hartford's growth and increased income were the result of quality products and "[f]avorable market conditions."  (J.A. 24.)  Appellees told investors: "We continue to consistently deliver great performance because of the strength of our business model," and "our execution has been great."  (J.A. 19, 30.)

Count 1 of the complaint alleges that The Hartford and the individual defendants violated § 10(b) of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act") and Securities Exchange Commission ("SEC") Rule 10b-5 by engaging in undisclosed contingent commission and bid-rigging schemes with insurance brokers for the purpose of maintaining artificially high market prices for The Hartford's publicly traded securities.  (J.A. 48-51.)  Count 2 alleges that the individual defendants also violated § 20(a) of the 1934 Act because they acted as "controlling persons" of The Hartford within the meaning of the Act.  (J.A. 12-13, 51-52.)

**C**

Since July 30, 2002, a private federal action for securities fraud must be commenced before the earlier of "2 years after the discovery of the facts constituting the violation" or "5 years after such violation." 28 U.S.C. § 1658(b). *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (2002) (codified at 28 U.S.C. § 1658 & note); *Shah v. Meeker*, 435 F.3d 244, 248–49 & n.3 (2d Cir. 2006) (citing Exchange Act § 9(e), 15 U.S.C. § 78i(e)).

The two-year statute of limitations for securities fraud claims under the Exchange Act begins to run only after the plaintiff "obtains actual knowledge of the facts giving rise to the action *or* notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *LC Capital Partners, LP v. Frontier Ins. Group*, *Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992)) (emphasis added). When there is no actual knowledge, but "the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Dodds v. Cigna Sec.*, 12 F.3d 346, 350 (2d Cir. 1993). "Such circumstances are often analogized to 'storm warnings.'" *Id.*

We have recognized in the past that determining "whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss. . . .'" *LC Capital Partners*, 318 F.3d at 156 (quoting *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997)). However, we have also stated that courts can "readily resolve the issue" of inquiry notice as a matter of law on a motion to dismiss – as has been done in "a vast number of cases" in this circuit – where "the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned

from the complaint and papers . . . integral to the complaint." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005) (internal quotation marks omitted); *see also LC Capital Partners*, 318 F.3d at 156; *Dodds*, 12 F.3d at 352 n.3 (citing *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 639 n.7 (S.D.N.Y. 1993) (citing cases)).

In granting Appellees' motion, the District Court relied on the "storm warnings" doctrine we have enunciated in recent years, beginning in *Dodds*, 12 F.3d 346. The plaintiff in *Dodds* was an unsophisticated investor who made clear to the investment-adviser defendant that she sought to pursue a conservative investment strategy. The defendant-adviser provided plaintiff with a portfolio of prospectuses and other information about the financial products he recommended. He assured the plaintiff that the investments he recommended (which included several limited partnerships) were suitable. Almost a year later, the plaintiff met with an accountant who told her that the investments in the limited partnerships were not suitable investments for her. Plaintiff alleged that she was induced to invest in securities that were too risky and illiquid for her. *Id.* at 347-50.

The district court dismissed the claims as time-barred, and we affirmed, stating that when an investor was given prospectuses that disclosed the risky and illiquid character of certain investments, she was placed on inquiry notice that such investments might be inappropriate for a conservative portfolio. *Id.* at 347. The fact that the plaintiff failed to read the prospectuses was irrelevant. The commissions, the risk, and the illiquidity of investments in the limited partnerships were clearly disclosed in the prospectuses received by the plaintiff in *Dodds*. *See id.* at 350. By receiving them, she had constructive notice of facts sufficient to create a duty to inquire further into the appropriateness of the investments. "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty

8

of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id.*.

Since *Dodds*, we have addressed the issue of what constitutes sufficient "storm warnings" to give rise to a duty to inquire in at least five published opinions. *See LC Capital Partners (Frontier II)*, 318 F.3d at 148; *Newman v. Warnaco Group, Inc.*, 335 F.3d 187 (2d Cir. 2003); *Levitt v. Bear Stearns & Co.*, 340 F.3d 94 (2d Cir. 2003); *Lentell*, 396 F.3d at 161; *Shah,* 435 F.3d at 244.

The plaintiffs in *LC Capital Partners* alleged that defendant Frontier engaged in negligent insurance practices, including under-reserving for claims. The defendants allegedly concealed these practices by making false statements and material omissions in a series of financial reports, press releases, and other public statements. *LC Capital Partners*, 318 F.3d at 150-52.

Frontier had taken several restructuring charges between 1994 and 1999. In press releases, the company provided various benign explanations for these charges, such as business expansion, or "adoption of a more conservative reserving policy." *See id.* at 151. In December 1998, Frontier announced a $139 million charge against reserves that "paid the bill" for past practices. *Id.* Soon after, Frontier issued a press release downplaying its financial troubles, and its CEO made similar misleading statements. Six months later, *National Underwriter* published an article discussing Frontier's problems. In March 2000, Frontier's rating was downgraded because of "significant under-pricing," and the next month Frontier issued a press release indicating that there was "substantial doubt about the Company's ability to continue as a going concern." *Id.* at 152. Plaintiffs filed suit in July 2000. At that time, the statute of limitations for securities fraud claims was three years from the date of the fraud or one year from the discovery

9

of the fraud or of facts that placed an investor of ordinary intelligence on inquiry notice. *See id.* at 154. The issue in *LC Capital Partners* was whether the lawsuit had been filed within a year after there were sufficient "storm warnings" to place an investor of ordinary intelligence on notice.

More than five years earlier, in November 1994, another class action against Frontier had been filed in the Eastern District of New York. *In re Frontier Ins. Group Sec. Litig.*, 172 F.R.D. 31 (E.D.N.Y. 1997)("*Frontier I* "). The complaint alleged that Frontier had fraudulently concealed and misrepresented its knowledge of "grossly inadequate" reserves and insufficient staffing. *Id.* at 153. In a report recommending denial of the plaintiff class's motion to amend the class period to extend through November 1999, the magistrate judge concluded that investors were on inquiry notice of the fraud no later than December 21, 1998—the date of the *National Underwriter* article discussing the massive $139 million reserve charge. *Id.* The district court approved the report and recommendation. Expressly following the finding of *Frontier I* that inquiry notice existed as of December 1998, the district court in *LC Capital Partners* dismissed that complaint. *Id.*

We affirmed, finding that Frontier's December 1998 announcement that it was taking a substantial reserve charge constituted a sufficient "storm warning" to place investors on inquiry notice of possible securities fraud. *Id.* at 155. This inquiry obligation was not excused by self-serving statements by Frontier's management that its reserve problems were behind it, because the three "substantial reserve charges" taken in the brief period from 1994 to 1998 should have alerted an ordinary investor about Frontier's financial troubles. *Id.* Although the *National Underwriter* article that specifically discussed Frontier's reserve problems "[a]lso contribut[ed] to a duty of inquiry" – as did the *Frontier I* litigation in the Eastern District – the multiple

reserve charges themselves were identified as the "principal warnings" in *LC Capital Partners*. *Id.*

A few months later, we decided *Newman* 335 F.3d at 187. The plaintiffs were stockholders of Warnaco, a clothing manufacturer. *Id.* at 189. Plaintiffs alleged that one of Warnaco's executives forced the company's Forecasting and Planning Division knowingly to increase its sales projections beyond its attainable or actual sales projections. Allegedly because of this fraudulent practice, excess inventory had to be written down in value or written off entirely. *Id.* Plaintiffs filed suit in August 2000, and the district court granted the individual defendants' motion to dismiss on statute of limitations grounds. *Id.* at 192. The court concluded that inquiry notice was triggered in April 1999, when Warnaco revised its Form 10-K for Fiscal Year 1998 to reveal "the dramatic reversals in financial data and the language of the 1998 Form 10-K." *Id.*

We vacated the dismissal, concluding that notice of the filing of the revised 1998 Form 10-K did not put reasonable investors on notice of any fraud. *Id.* at 195. The 1998 Form 10-K "did not contain *any* indication" that the cause of the inefficiency costs was inventory fraud, which was the basis of plaintiff's complaint. *Id.* at 194 (emphasis in original). It was "reasonable for Plaintiffs not to inquire" after the April 1999 filing, because Warnaco had provided the "seemingly benign explanation" that it had revised its financial information to conform to changed accounting methods. *Id.*

The next month, in *Levitt v. Bear Stearns & Co.*, we again vacated the district court's dismissal of a securities fraud suit, this time because there was a genuine issue of fact about whether investors had sufficient "storm warnings" to commence the limitations period— an issue that could not be decided on a motion to dismiss. 340 F.3d at 96, 104. Plaintiffs – investors who

11

used a brokerage firm to purchase stock of ML Direct, Inc. following an initial public offering of its securities – claimed that defendant Bear Stearns had knowingly participated in a fraudulent scheme perpetrated by the brokerage involving the IPO. Bear Stearns had acted as the clearing agency for the brokerage.

The *Levitt* plaintiffs commenced their action in February 1999. *Id*. at 100. The district court held that plaintiffs' claim was time-barred, finding that there were sufficient "storm warnings" so that a reasonable investor should have discovered Bear Stearns' alleged role more than one year (the then-applicable limitations period) before the complaint was filed. *See id.* at 101. These "storm warnings" included a March 1997 National Association of Securities Dealers ("NASD") arbitration proceeding against Bear Stearns, in which market manipulation with regard to the IPO was alleged, as well as an action commenced in Texas federal court against the brokerage and Bear Stearns in August 1997. *Id*. at 99-100.

*Levitt* differed from prior "storm warnings" cases, because it alleged liability against a secondary wrongdoer: plaintiffs sued the clearing agent (Bear Stearns), not ML Direct, the company whose stock price dropped. The *Levitt* plaintiffs conceded that their duty to inquire about goings-on at ML Direct arose toward the end of 1996, when they learned of their investment losses. *Id*. at 102. However, plaintiffs could not have "allege[d] a prima facie case against Bear Stearns simply by examining ML Direct's financial statements and media coverage of the company." *Id*. at 103. The issue in *Levitt* was whether plaintiffs had exercised reasonable diligence in discovering the facts that established Bear Stearns' participation in the brokerage's fraudulent scheme. *Id*. at 103. We vacated the district court's dismissal of the complaint because there were factual disputes about (1) the scope of the inquiry conducted by plaintiffs and (2) whether reasonable inquiry could have revealed enough information to satisfy the strict

pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). We concluded that "discovery should have been permitted on the question of what information was realistically available to Plaintiffs and when it was available." *Id*. at 104.

In *Lentell v. Merrill Lynch & Co.,* we found that the "storm warnings" about defendants' conflict of interest were insufficient to give rise to inquiry notice. 396 F.3d at 170-71. The plaintiffs in *Lentell* claimed that Merrill Lynch and its star analyst, Henry Blodget, issued misleading favorable reports intended to artificially inflate the stock prices of companies that were clients of the firm's investment bank, in order to cultivate investment banking business from those clients. *Id*. at 165. Plaintiffs did not own stock in defendant Merrill Lynch; rather, they were investors of the companies that were the subject of Blodget's allegedly misleading reports. *Id*. at 164.

The *Lentell* lawsuits were filed shortly after the New York Attorney General announced an investigation into Merrill's practices. *Id*. The district court concluded that plaintiffs' claims were time-barred because articles that appeared in the financial press years earlier had placed investors on inquiry notice of Merrill's alleged misconduct. *Id.* at 168, 170. Although we affirmed dismissal on the alternate ground that plaintiffs failed to state loss causation, *id*. at 176, we found, as an antecedent matter, that investors were *not* put on inquiry notice of possible securities fraud by "generic articles on the subject of structural conflicts [at financial firms]" that appeared in the financial press. *Id.* at 170. We stated:

> Conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud—let alone furnish a basis sufficiently particular to support a fraud complaint. Nor does the existence of temptation trigger a duty of inquiry— at least, not by a reasonable investor. Something more than conflicted interest is required, no matter how well publicized the conflict may be.

13

*Id.* Emphasizing the circumstance-specific nature of the inquiry notice determination, we found that the "articles relied upon to support that [the district court's] finding fall well short of the specificity required to prompt further inquiry by a reasonable investor." *Id.*

In *Shah v. Meeker*, decided one year after *Lentell*, the alleged fraud was Morgan Stanley's representation to investors that its research analysts – including senior analyst Mary Meeker – were unbiased and objective. 435 F.3d at 245. Mr. Shah, a Morgan Stanley shareholder, claimed that the conflict of interest between the research and investment banking groups at Morgan Stanley – together with the failure to disclose improper practices to shareholders – artificially inflated the price of Morgan Stanley's stock, and resulted in a loss to him when Morgan Stanley's conflict of interest came to light and the value of its stock decreased. *Id*. Morgan Stanley's stock dropped immediately after the NYAG announced an investigation in April 2002; Shah brought his suit in July 2003. 435 F.3d at 247-48.

The "storm warnings" in *Shah* were: a 1996 *Wall Street Journal* article on page C1 generally describing the conflict of interest; another general article in the *Journal* in 1998; one article about Mary Meeker in *The New Yorker* in 1999; and two articles in *Fortune*, including a feature article about Mary Meeker in May 2001. *Id.* at 247.

In *Shah*, we affirmed the district court's conclusion that the complaint was time-barred. We noted that, "'Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate,'" *Id*. (quoting *Lentell*, 396 F.3d at 169), and that, "Information contained in articles in the financial press may trigger the duty to investigate." *Id.* (citing, *inter alia*, *LC Capital Partners*, 318 F.3d at 155). We concluded that inquiry notice was triggered no later than May 2001, when *Fortune* magazine featured an article that specifically described the practices of Morgan Stanley and Mary Meeker. *Id.* at 249, 251. In contrast to the press reports

14

that were found to be insufficient in other decisions (like *Lentell*, and *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 300 (S.D.N.Y. 2004)), the *Fortune* article in *Shah* "did not report the mere existence of a conflict of interest," but "described the alleged conflicts of interest" with a "degree of specificity" sufficient to put the plaintiffs on notice of a possible cause of action. 435 F.3d at 250-51. We expressly declined to address whether the other articles cited by defendants as "storm warnings" would have triggered a duty to inquire. *Id*. at 252.

Against the backdrop of this jurisprudence, we turn to the "storm warnings" relied on by Appellees in this case.

**D**

To support their contention that the market was aware of the information underlying the alleged fraud long before this action was filed, Appellees identified the following information that was publicly available: complaints in four lawsuits that were filed in California and Illinois state courts between 1999 and 2001; various articles from news sources and industry newsletters; portions of regulatory filings filed by The Hartford with the SEC; and samples of insurance filings that The Hartford files annually for each of its insurance subsidiaries in every state in which the subsidiaries are domiciled (the "Insurance Expense Exhibits"). *Staehr*, 460 F. Supp. 2d at 335. Appellees also submitted three press releases that reported on the NYAG's enforcement actions pertaining to contingent commissions, but these releases were all issued in or after June 2004 and so do not advance their argument. (J.A. 184, 210, 287-88.)

### 1. Lawsuits

#### a. *Daniel v. Aon Corp.*

*Daniel v. Aon Corp.* was filed in Illinois Circuit Court, Cook County, on August 19, 1999 by Alan Daniel, an Illinois insurance agent who had obtained an errors and omissions policy through Aon. *Daniel v. Aon Corp., et al.*, No. 1999-CH-11893 (Ill. Cir. Ct. 1999). Mr. Daniel brought this class action against Aon Corporation and Aon Group, Inc., on behalf of purchasers of commercial insurance through Aon's brokerage services.

The complaint alleged that Aon and its affiliates received undisclosed financial incentives from insurers that caused them to refer business to insurance companies even if the policy quoted by the insurer was not in the best interest of the customer. The complaint also referenced a 1999 *New York Times* article (another exhibit submitted by Appellees) for the proposition that large commercial brokers had an incentive to steer business to those insurers that offered the biggest kickbacks, rather than to those that provided the best coverage and lowest prices to the insureds. ( J.A. 161.) Amended complaints were filed on November 1, 1999, and February 9, 2001. The Hartford was neither named as a party nor mentioned in any of the complaints.

The *Daniel* lawsuit was mentioned in an insurance industry newsletter, *National Underwriter*, on October 2, 2000. None of the materials pertaining to the *Daniel* lawsuit (including the *National Underwriter* article) mentions The Hartford.

#### b. *Turner I*

*Turner v. Aon Corp.* ("*Turner I*") was filed on December 23, 1999, in California Superior Court, County of Monterey. *Turner v. Aon Corp., et al.*, No. M 47230 (Cal. Super. Ct. 1999). Plaintiff Scott C. Turner – a California attorney who specializes in insurance law – sued major

16

brokers, including Aon, Marsh and Willis Corroon (and their affiliates), on behalf of the general public. (J.A. 123-32.)

The *Turner I* amended complaint alleged that, since at least 1986, and without policyholders' knowledge, defendant brokers entered into "undisclosed agency contracts" with insurance companies, pursuant to which the defendants were paid commissions based upon the amount of business they produced for the insurance companies. (J.A. 128, ¶¶ 23-24.) These undisclosed agency contracts allegedly created a conflict of interest between the financial interests of the defendants and the interests of their policyholder clients.

Turner did not sue The Hartford, and the complaint mentioned the company only once, when it alleged, "The insurance companies which entered into the undisclosed agency contracts with the defendants include The Travelers Insurance Group, The Chubb Group of Insurance Companies, The Hartford Insurance Group and, upon information and belief, other major property and casualty insurance companies." (J.A. 128 ¶ 24.)

The October 2000 *National Underwriter* article mentioned above also noted the *Turner I* lawsuit, but as with the *Daniel* action it did not implicate The Hartford or any other insurer. The allegation from the *Turner I* complaint that is quoted above did not appear in the article, which stated only that the *Turner I* suit claimed that "*brokers* should have disclosed the fees to their clients earlier and that the fees should have been passed onto their clients." ( J.A. 224 (emphasis added).)

### c. *Village of Orland Hills v. Arthur J. Gallagher & Co.*

*Village of Orland Hills*, filed on September 22, 2000, in Illinois Circuit Court, Cook County, was a class action alleging that Gallagher – a broker – breached its fiduciary duties "by receiving undisclosed contingent commissions (kickbacks) from insurance companies for

17

insurance placed on behalf of its insureds." *Village of Orland Hills v. Arthur J. Gallagher & Co.*, No. 00-CH-13855 (Ill. Cir. Ct. 2000). ( J.A. 171 ¶ 1.)

The complaint also alleged that Gallagher's contingent commission agreements with insurance companies created a conflict of interest, in breach of fiduciary duties, because the broker puts its financial interests first, secretly profiting at the expense of its clients by placing insurance policies with those insurance companies which pay contingent commissions. (J.A. 174 ¶ 15.) No insurer, including The Hartford, was named as a defendant.

The *Village of Orland Hills* lawsuit was discussed in a brief (167 word) "squib" that appeared in the *Chicago Tribune*. The article succinctly summarized the allegations in the complaint. (J.A. 227.) Neither The Hartford nor any other insurer was mentioned in the *Tribune* article.

### d. *Turner II*

*Turner v. Hartford Fire Ins. Co., et al.* ("*Turner II*") was filed by Scott C. Turner on July 25, 2001, in California Superior Court, County of San Francisco. *Turner v. Hartford Fire Ins. Co., et al.*, No. 323192 (Cal. Super. Ct. 2001); (J.A. 134-53.) Among the defendants were a number of insurance companies, including various Hartford subsidiaries, although not The Hartford Financial Services Group, Inc., the Defendant in this action.

The *Turner II* complaint alleged that the defendants entered into "Undisclosed Agency Contracts" with brokers, whereby the defendants paid brokers millions of dollars in undisclosed fees and commissions based upon the amount of business produced for the defendants by the brokers. (J.A. 140 ¶¶ 26-27.) According to the complaint, these fees and commissions constitute "kickbacks to brokers of premiums paid to defendants by policyholders." (*Id.* ¶ 27.) The complaint also alleged that the defendants engaged in unfair business practices, and breached

18

their duty of good faith and fair dealing by failing to disclose the contingent commissions (and the concomitant increased cost of premiums to cover these commissions), to their policyholders. (J.A. 144.) In addition, the complaint alleged that the insurer defendants helped brokers prepare statements to claimants that contained false or misleading information about the material fact that brokers had a conflict of interest. (J.A. 148.)

The *Turner II* complaint contained many allegations that appear in the instant complaint concerning the broker-insurer commission scheme (though no allegations about bid rigging or price manipulation). However, this lawsuit apparently flew under both industry and press radar screens. Filed in a California state court, it was not discussed in any of the press articles submitted by Appellees. The lawsuit also was not mentioned in any of The Hartford's public filings. Based on the exhibits submitted by Appellees, the only way this lawsuit could have come to the attention of the investing public was if someone had encountered it while examining the docket of the Superior Court of San Francisco County.

### 2.      Media Reports

The news articles that allegedly constituted part of the "storm warnings" can be broken into two categories: (i) stories in mainstream publications, and (ii) stories in industry publications or newsletters. The former includes one article that appeared in the *New York Times*, two *Financial Times* articles, and a short piece in the *Chicago Tribune*. The other thirteen articles appeared in three publications directed to the insurance industry: *National Underwriter*, *Business Insurance*, and *Canadian Underwriter*.

The articles submitted to the court by Appellees focused primarily on brokers, not insurance companies. None of the articles from mainstream publications so much as mentioned The Hartford, and only one of the industry newsletters did. Moreover, many of the articles

19

appearing in 1999 or later suggested that concerns about disclosure had been resolved or, at the very least, that brokerages were working toward a solution.

### a. Mainstream Publications

#### i. *New York Times*

On February 14, 1999, the *New York Times* ran an article titled *Insurers Pay the Brokers, Making Customers Wary*. (J.A. 229-31.) This article appeared on the fourth page of the business section. It began by describing the controversy surrounding brokers' receipt of contingent commissions from insurance companies:

> The rapid consolidation of the brokerage industry is making contingency fees even more controversial. Two giant brokers, [Marsh and Aon,] now dominate the field. And risk managers . . . have become increasingly concerned that brokers, less restrained by competition, could concentrate their business with insurers that offer the biggest incentives rather than those that provide the best service and lowest prices.

According to the article, these contingency fee arrangements were not generally known until recently, in part because brokers downplayed their importance:

> Many corporate executives said they had been unaware of contingency fees until recently. State regulators in New York say they, too, were in the dark. * * * The brokers acknowledge that they have not called attention to contingency fees but say they have always been willing to discuss them in general terms, if asked. They say that the payments from the insurers are a small part of their total revenue – no more than 5 percent – and that the fees do not influence their choice of carriers.

The article also presented the insurance companies' point of view regarding contingency fees, implying that the insurers were at the mercy of the brokerage firms that had come to dominate the industry:

> But the insurance companies that pay the fees see them differently. Though some insurers do not pay contingency fees, many others

20

> consider them a necessary tool for making sure they get a slice of the pie.

The article concluded by noting regulators' emphasis on disclosure, but also mentioning that there was no proof customers had suffered financially because of the practice.

> [L]ast summer, after becoming aware of the controversy, the New York State Department of Insurance issued a formal reminder that according to state law insurance buyers should be informed of all compensation arrangements between insurer and broker so they can 'understand the costs of coverage and the motivation of their broker.' . . . . The New York regulators and the risk managers were unable to cite cases in which brokers had arranged coverage that might have been bought for less or had steered customers to insurers that failed to meet clients' needs in other ways.

The Hartford was not mentioned in the article— a particularly important omission, since the writer acknowledged that not all insurers paid contingency fees to get business.

### ii.      *Financial Times*

The *Financial Times* ("*FT* ") ran articles on the contingent commissions story: *Aon Set to Disclose Fees*, March 16, 1999; and *Consolidation at Relentless Pace*, April 28, 2000.  (J.A. 233-36.)

The March 1999 article appeared at page thirty-three.  (J.A. 233.)  This article noted that both Marsh and Aon took steps to disclose to clients their contingent commission revenue after brokers had "come under fire" for receiving millions of dollars in fees and incentives from insurance underwriters in addition to the payments they receive from clients.  According to the article, Marsh and Aon – which had become the dominant brokerages as a result of consolidation in the global broking industry – were "clearly anxious to avoid criticism from regulators," especially after "the New York State Insurance Department [in 1998] said lack of transparency over broker remuneration could be construed as a violation of the state's insurance law."

The April 2000 article – which appeared at page three – is similar to the *FT* article discussed above, to the point of repeating verbatim many of the same phrases. The article also referred to brokers' receipt of "incentive payments" as "double dipping," which, according to the article, "called into question the principle that customers should receive 'best advice' and raised doubts over conflict of interest." (J.A. 235-36.) The Hartford was not mentioned in the article.

### iii. *Chicago Tribune*

As noted already, on September 23, 2000, an article on page five of the *Chicago Tribune* discussed the *Village of Orland Hills* lawsuit, which focused on the practices of broker Arthur J. Gallagher & Co. The article did not mention The Hartford or any of its competitors.

### b. Industry Publications

The industry newsletters submitted by Appellees date back to 1997. The articles that appeared in these niche publications also focused on the allegations against brokers, not insurance companies.

An October 13, 1997 article in *Business Insurance* discussed the possibility that consolidation of insurance brokerages might result in brokers using their clout to extract larger commissions. Though The Hartford was not mentioned, the article did name a broker (Marsh) and an insurer (Chubb), noting that "the business placed with Chubb through [Marsh's] Global Broking Centers is subject to a 'placement services agreement' . . . [which] grants [Marsh] an additional commission for the placement of large volumes of business through the centers." The article went on to say: "Other U.S. brokers have commission agreements with insurers providing for the payment of contingent commissions based on the profitability of the business they place with insurers." (J.A. 238.) It did not identify those brokers or insurers.

22

An April 27, 1998 article in *Business Insurance* concentrated on the behavior of brokers abroad: "Recent U.K. media reports have implied that large brokers, unbeknownst to their policyholder clients, have been using size and market share to strong-arm insurers into entering incentive commission arrangements." Citing the potential conflict of interest for brokers, the article noted that "U.K. risk managers echo concerns voiced by their U.S. counterparts over whether some forms of contingent commissions could lead to brokers placing their business with an insurer that is not necessarily providing the best coverage for their exposures." (J.A. 242.)

The May 11, 1998 *Business Insurance* article submitted by Appellees highlighted some of the issues that were discussed at the Risk and Insurance Management Society ("RIMS") annual conference. The article stated that the issue of contingent commissions had "come to a head" with the consolidation of the brokerage industry and concomitant increased clout for the largest brokers. But the article also quoted brokers who argued that placing a large volume of business with a certain insurance company actually benefited policyholders, because it led to a strong relationship between the brokerage and the insurance company, allowing brokers to solve their policyholders' problems. (J.A. 246-48.)

A June 15, 1998 *National Underwriter* article discussed the increased attention to contingency fees in the U.K., noting a proposal which called for a code of conduct that would make payment of incentives to brokers illegal in that country. But the article also included a statement by the Chief Executive of the British Insurance and Investment Brokers Association, who said: "There is no evidence, no suggestion, no clients coming forward saying, 'We think brokers are abusing their positions of power, their size, their leading position in the marketplace, to our detriment.'" (J.A. 250.)

23

Several of the articles submitted by Appellees appeared in industry publications in the first half of 1999. Although they discussed the controversy surrounding the contingent commissions received by brokers, these articles also emphasized brokers' efforts to respond to calls for disclosure of their contingent commission arrangements.

The January 18, 1999 *National Underwriter* article stated that "recent industry attention . . . has focused on the issue of disclosing [contingency fee] arrangements . . . . [T]he New York State Department of Insurance issued a circular letter recommending that brokers allow clients access to this information as well." (J.A. 254-55.) The article discussed the possibility of a market solution to contingency fee arrangements, noting that broker Willis Corroon had negotiated "carve-out arrangements" with certain clients who asked to take their premium out of the contingency fee equation. *Id.*

Appellees also submitted an article titled "RIMS, Broker in Deal to Reveal Commissions," which appeared in *Business Insurance* on February 1, 1999. This article, which focused on Marsh but also mentioned brokers Aon and Willis, noted that contingent commissions were not necessarily a problem, although they should be disclosed. According to the article, "Risk managers have voiced concerns that the commissions, which are paid by insurers to brokers based on volume targets and the profitability of the business, may create a conflict of interest." (J.A. 257-59.)

Another *Business Insurance* article, from February 22, 1999, discussed Aon's efforts to notify clients of the potential contingent commissions it received based on the volume of business it placed with insurers. (J.A. 262.)

Likewise, the March 1999 *Canadian Underwriter* article submitted by Appellees noted that "[Marsh had] agreed to reveal contingency commission arrangements to clients on request."

The article quoted a senior vice president of Willis Corroon, who emphasized the brokerage's transparency with clients: "We don't consider contingencies a huge issue, it accounts for less than 2% of our total revenues. So we have nothing to hide from our clients and are willing to negotiating [sic] unique deals." According to the article, however, "Risk managers . . . [were] disappointed it ha[d] taken the weight of the industry to compel disclosure." (J.A. 265.)

Five industry newsletters from 2000 mentioned or alluded to the *Turner I* lawsuit. One of those articles also referred to the *Daniel* suit. Not a single industry publication (at least, none included in the record in this case) picked up on the *Turner II* lawsuit, in which The Hartford's subsidiaries were named as defendants and allegations approximating those asserted here were made.

Only one of the so-called "storm warnings" from the industry/niche press mentioned The Hartford: an article that appeared in *National Underwriter* on February 14, 2000. Referring to the *Turner I* complaint, the article picked up on the mention of The Hartford in the complaint: "The three top brokers are being sued by an attorney who alleges that the firms . . . deceived policyholders in the state of California by their failure to disclose contingency fee arrangements. . . . These contingency fee contracts were made with insurers including The Travelers Insurance Group, The Chubb Group of Insurance Companies, The Hartford Insurance Group, and possibly other major property-casualty insurers, according to the suit." (J.A. 212.)

The same day, an article about *Turner I* appeared in a publication called *Business Insurance*. (J.A. 213-15.) The *Business Insurance* article, however, did not mention The Hartford or any other insurer, and focused entirely on the alleged misconduct by brokers. "In an effort to compel brokers to disclose contingent commissions they earn, a law firm known for battling commercial insurers on behalf of policyholders is suing the world's three largest

25

brokers," the article said. "The [*Turner I*] suit names Aon Corp., Marsh Inc., Willis Group Ltd., their units, and other companies the brokers have acquired or merged with. The plaintiff is a California attorney associated with Anderson, Kill." The article summarized the *Turner I* complaint's allegations as follows:

> The suit arises from some brokers' practice of collecting contingent commissions from insurers with which they place business. These fees, which may be paid to the broker without a policyholders' knowledge, can be rewards for the volume of business placed with an insurer, as well as compensation for services the broker performs on the insurer's behalf.

The article noted, however, that the lawsuit "is not supported . . . by [RIMS], the largest organization of commercial insurance policyholders," and that the president of RIMS was taken aback by the lawsuit, saying that the issue of contingent fees was "not even on my radar screen right now." (J.A. 213.)

Like several of the other articles from industry newsletters, this article mentioned that brokers had agreed to reveal some of their commission arrangements. It noted that RIMS "focused attention" on the issue of contingent commissions at its annual meeting in 1998, resulting in the negotiation of a "voluntary policy of disclosure with Marsh and later Aon." Again indicating that brokers, not insurers, were the target of the lawsuit, the article cited an industry source as saying, "The brokers named in the complaint have united to defend against it." The *Turner I* suit was identified in the article as the first lawsuit over contingent fee arrangements of which industry sources were aware, and the article quoted the senior litigation counsel of Aon Corp. as saying, "Let everybody draw their own conclusions" from the fact that a lawyer was the named plaintiff. (J.A. 214.)

26

Two weeks later, on February 28, 2000, another article appeared in *National Underwriter*. This article, which was written in the style of an editorial, mentioned the legal challenge to brokers' contingency fee arrangements but questioned the viability of the lawsuit:

> The question now is whether a legal challenge to the contingency-fee system will hold up in court, and if it does, what impact this will have on the brokerage community financially and operationally. * * * [*National Underwriter*] has taken brokers to task a number of times for the way in which contingency fees have been kept from policyholders. . . . We applauded the fact that after much arm-twisting, the major brokers seemed to come clean about contingency fees. * * * However, while we stand squarely with the consumer on this issue, we are frankly skeptical about this lawsuit's merits. * * * Bottom line, as outspoken as we were about the need to disclose contingency-fee arrangements to clients, we believe this is an ethical, rather than a legal issue – unless the plaintiffs can actually prove individual instances of conscious malpractice by brokers.

(J.A. 217-18.)

Similarly, a May 1, 2000 *National Underwriter* article expressed skepticism about the *Turner I* lawsuit, describing it as "an attempt to revisit the [contingent commissions] issue," and noting that the lawsuit does not name specifically any of the defendant-broker's clients who were injured by the fee arrangements. The article also quoted the president of RIMS as saying that, because the three major brokers had agreed to disclose their fee policies, the issue of contingent commissions was "over" and lawsuits were a "waste of money and time." (J.A. 220-22.) Again, The Hartford was not mentioned in the article.

The most recent piece from a niche publication appeared in *National Underwriter* on October 2, 2000. After discussing *Turner I* and *Daniel* (without mentioning The Hartford or other insurers), it suggested that the contingent commissions issue had been resolved, noting that the "storm appeared to be over" in early 1999. According to the article, representatives from RIMS and the brokerage firms said that there had been "little talk" about contingency fees since

the disclosure policies were announced.  Nevertheless, the article noted, "the announcements of the disclosure agreements did not stop suits from being filed in California and Illinois.  In both cases . . . the suits claim that the brokers should have disclosed the fees to their clients earlier and that the fees should have been passed onto their clients."  (J.A. 224-25.)

### 3.   Regulatory Filings

Finally, Appellees submitted certain documents that are required to be filed each year by The Hartford's subsidiaries in states where they are domiciled (the Insurance Expense Exhibits). *See* Appellees' Br. at 30.  The record includes exemplars of such filings for the years 1997-2002. (J.A. 268-79.)  Appellees also submitted portions of a Form 10-K filed by The Hartford in 2001. (J.A. 281-82.)

The various operating expenses incurred by the filing subsidiaries are grouped into various categories.  There is a category called "Commission and Brokerage."  Under this heading are various rows, one of which is headed "Acquisition, Field Supervision and Collection Expenses."  A "contingent – direct," "contingent-reinsurance assumed," and "contingent – reinsurance ceded" line items appear under this heading and row in the Insurance Expense Exhibits.  (J.A. 269, 271, 273, 275, 277, 279.)

The record also includes an excerpt from The Hartford's Form 10-K for 2000, filed with the SEC on March 23, 2001.  At page 96 of this 166 page document the following language appears: "Retrospective and contingent commissions and other related expenses are incurred and recorded in the same period that the retrospective premiums are recorded or other contract provisions are met."  (J.A. 281-82.)

**E**

Taking judicial notice of the materials described above, the District Court concluded that the "lawsuits and press accounts" from 1999 to 2001 "clearly spelled out the existence of contingent commission kickback schemes between insurance companies and brokers." *Staehr*, 460 F. Supp. 2d at 338. Even though The Hartford was not mentioned in any of the mainstream articles – and was mentioned but once, and fleetingly, in one article in an industry newsletter – the District Court concluded that, "The obvious inference has to be that whatever practice the brokerage companies employ as to some insurance companies (and here the relevant practice is the contingent commissions) they employ as to most or all of the insurance companies." *Id.* Given The Hartford's status as one of the largest insurers, the District Court reasoned, it would have seemed "especially likely" to a reasonable investor that The Hartford was among the insurers paying contingent commissions. *Id.*

The District Court also concluded that, while the "storm warnings" materials included no reference to The Hartford's bid-rigging schemes or the magnitude of the kickbacks it paid, there was "clearly enough information available to place the plaintiffs on notice of the large majority of the fraud they allege." *Id.* at 339. The District Court reasoned that the "cumulative effect of the publicly available documents should have suggested to a reasonable investor of ordinary intelligence that The Hartford was likely one of the insurance companies paying contingent commissions to the insurance brokers." *Id.* (internal citation and quotation omitted).

For the date by which inquiry notice was triggered, the District Court selected July 25, 2001— the date the *Turner II* lawsuit was filed in California Superior Court. The court emphasized the fact that the *Turner II* complaint named subsidiaries of The Hartford as defendants and specifically alleged that they paid millions of dollars in undisclosed fees and

29

commissions to brokers. *Id.* at 338. The court did not discuss the fact that there was no evidence in the record that the lawsuit had received any publicity.

Because Appellants did not claim to have undertaken any investigation with respect to Appellees' alleged non-disclosure, the District Court ruled that they were on constructive notice of the fraud as of July 25, 2001, "the time [*Turner II*] was filed." *Id.* at 339. The District Court then held that this lawsuit, filed in 2004, was barred by the Exchange Act's applicable two-year statute of limitations. *Id.* at 340.

## II.   DISCUSSION

### *Standard of Review*

We review the District Court's grant of Appellees' Rule 12(b)(6) motion to dismiss *de novo*, accepting as true all factual allegations in the complaint and construing all reasonable inferences in the non-movant's favor. *See, e.g.*, *Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 115 (2d Cir. 2008); *Shah*, 435 F.3d at 248. We review the District Court's determination of whether to take judicial notice of facts for abuse of discretion. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005); *United States v. Byrnes*, 644 F.2d 107, 112 (2d Cir. 1981); *accord In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1323 (3d Cir. 2002).

### *Analysis*

This appeal raises two issues: whether the District Court's decisions to take judicial notice of documents not within the four corners of the complaint and to consider those judicially noticed documents as part of the motion to dismiss were proper; and whether the materials

identified as "storm warnings" were sufficient to put an investor of ordinary intelligence on inquiry notice of the frauds alleged in the complaint.

### A.    Judicial Notice

The District Court took judicial notice of, *inter alia*, media reports, state court complaints, and regulatory filings. *See Staehr*, 460 F. Supp. 2d at 335; *see also* J.A. 122-82, 211-82, 799.  The court did "not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters [had] been publicly asserted."  *Staehr*, 460 F. Supp. 2d at 335.

Appellants argue that, because none of these materials is cited or referred to in the Complaint, the District Court should have granted their motion to strike these materials from the record.  They assert that the District Court impermissibly "reached far outside the Complaint" to dismiss their claims, and erroneously used these materials to draw inferences in favor of Appellees about what an ordinary investor would have known.  *See* Appellants' Br. at 14, 18. Appellants cite *Levitt* for the proposition that it is error to determine that inquiry notice was triggered without first permitting discovery on what information was "realistically available" to Appellants and when it was available.  *See Levitt*, 340 F.3d at 104.  And they argue that the District Court's decision to take judicial notice of the materials submitted by Appellees conflicts with our decisions in *LC Capital Partners* and *Dodds*, and so is grounds for reversal.

None of these contentions is persuasive.

We have previously held that it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called "storm warnings" were adequate to trigger inquiry notice as well as other matters.  *See Global Network Commc'ns, Inc. v. City of*

31

*New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings." (citation omitted)); *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (SEC filings); *LC Capital Partners*, 318 F.3d at 155 (press coverage and prior litigation); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings."). In *Kramer*, we found that the district court could take judicial notice of, *inter alia*, the publicized condition of the junk bond market during the relevant time period. The reference was not relied on for its truth, and so was not "a ground for decision and does not run afoul of the rule that a district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6)." 937 F.2d at 773; *accord DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 214 (3d Cir. 2007) (taking judicial notice of *USA Today* and *Time Magazine* articles submitted by defendants).

Here, the District Court did not abuse its discretion in denying Appellants' motion to strike the materials submitted by Appellees for judicial notice purposes. The materials, like those in Kramer, were offered to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings, which is all that is required to trigger inquiry notice. None of those materials were offered for the truth of the matter asserted.

Appellants further argue that the District Court erred in considering judicially noticed materials in ruling on the motion to dismiss without first converting the motion to one for summary judgment. Although the general rule is that a district court may not look outside the complaint and the documents attached thereto in ruling on a Rule 12(b) motion to dismiss, we have acknowledged that the court "may also consider matters of which judicial notice may be

taken." *Kramer*, 937 F.2d at 773. We have stated that, "Dismissal under FED. R. CIV. P. 12(b)(6) is appropriate when a defendant raises . . . [a statutory bar] as an affirmative defense and it is clear from the face of the complaint, *and matters of which the court may take judicial notice*, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000) (emphasis added). Appellee's motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) was a proper means to plead that the claim should be dismissed as untimely.

The lapse of a limitations period is an affirmative defense that a defendant must plead and prove. FED. R. CIV. P. 8(c)(1). However, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint. *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *see also* 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1226 (3d ed. 2004) ("[T]he current trend in the cases is to allow [the statute of limitations defense] to be raised by a motion to dismiss under Rule 12(b)(6) when the defect appears on the face of the complaint."). Timeliness is "material when testing the sufficiency of a pleading." FED. R. CIV. P. 9(f).

Appellants' argument that the District Court erred by considering "matters outside the pleading" without converting Appellees' motion to one for summary judgment is predicated on the ground that a Rule 12(b)(6) motion to dismiss "shall be treated as one for summary judgment" if matters outside the pleadings are presented to and not excluded by the court. *See* FED. R. CIV. P. 12(b). However, matters judicially noticed by the District Court are not considered matters outside the pleadings. 5 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1366 & n.33 (3d ed. 2004) ("[M]atters of which the district court can take judicial notice" are "not considered matters outside the pleadings for purposes of conversion.") Thus, the District

Court did not err in declining to convert Appellees' Rule 12(b)(6) motion to a motion for summary judgment.

Despite Appellants' assertions to the contrary, the District Court simply took judicial notice of Appellees' exhibits for the purpose of establishing that the information in the various documents was publicly available. *Staehr*, 460 F. Supp. 2d at 335. The court did not consider the contents of those exhibits for their truth. The District Court's finding that Appellants were placed on inquiry notice in July 2001 was based on a determination that publicly available materials (whether true or not) "should have suggested to a reasonable investor of ordinary intelligence" that The Hartford was likely one of the insurance companies allegedly paying contingent commissions to brokers, thus suggesting to investors the probability that they were being defrauded. *See id.* at 339.

While we have no quarrel with the District Court's decision to take judicial notice of what information was "out there," we do disagree with its conclusion that the total mix of information before it was sufficient to rule, as a matter of law, that an investor of ordinary intelligence was on inquiry notice of The Hartford's allegedly fraudulent conduct by July 2001. This decision does not foreclose the District Court from revisiting this issue at the summary judgment stage or at trial.

**B.     The Exhibits Did Not Place the Appellants on Inquiry Notice by July 2001**

The date on which one imputes knowledge to a reasonable investor for purposes of "constructive" or "inquiry" notice varies, depending on what the investor does after being placed on constructive notice:

> If the investor makes no inquiry once the duty arises, knowledge
> will be imputed as of the date the duty arose.  However, if the

investor makes some inquiry once the duty arises, [this Court] will impute knowledge of what an investor in the exercise of reasonable diligence, should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.

*LC Capital Partners*, 318 F.3d at 154 (citations and internal quotation marks omitted). As we said in *Dodds*, "Equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." 12 F.3d at 350 (internal citations and quotation marks omitted).

Here, Appellants do not claim to have made any inquiry prior to the NYAG's announcement in 2004. Since well-settled law in this Circuit penalizes a plaintiff who fails to make some inquiry after the "storm warnings" have given rise to constructive notice, the issue before us is whether a duty of inquiry existed prior to October 15, 2002, two years before this suit was filed. *See* 28 U.S.C. 1658(b).

For inquiry notice to exist, the triggering information must "relate[] directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants." *Newman*, 335 F.3d at 193; *see Levitt*, 340 F.3d at 104.

Whether a plaintiff was placed on inquiry notice is analyzed under an objective standard. *See, e.g., Lentell*, 396 F.3d at 168; *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997). This objective determination can be resolved as a matter of law— it need not be made by a trier of fact. *See Dodds*, 12 F.3d at 350 (rejecting the argument that "whether an investor of ordinary intelligence would be on inquiry notice in the circumstances described in the complaint is for a trier to determine" and could not be resolved as a matter of law).

"Storm warnings" need not detail every aspect of the alleged fraudulent scheme: "An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry

35

notice." *Dodds*, 12 F.3d at 352. Rather, a totality-of-the-circumstances analysis applies. *See Shah*, 435 F.3d at 249 (noting that a duty to inquire "arises 'when the circumstances would suggest to an investor of ordinary intelligence the probability'" of fraud (quoting *Dodds*, 12 F.3d at 350)); *see also de la Fuente v. DCI Telecomm., Inc.*, 206 F.R.D. 369, 383 (S.D.N.Y. 2002) ("The issue . . . is whether the objective facts and circumstances, taken as a whole, provided inquiry notice.") (emphasis omitted). Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct. *see, e.g.*, *Nivram Corp.*, 840 F. Supp. at 249.

Appellants contend that the exhibits submitted by Appellees are too vague and non-specific to suggest to an investor of ordinary intelligence the probability of fraud by The Hartford. Appellants also argue that the bulk of the judicially noticed information was not reasonably accessible to the ordinary investor. Based on a review of the record in this case, we find these arguments sufficiently compelling that the case cannot be decided on a motion to dismiss.

### 1. Press Report

It is unremarkable that courts consider the extent of media coverage in deciding when inquiry notice for securities fraud claims was triggered. *See, e.g.*, *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 523 (S.D.N.Y. 2005) (noting that determination of whether storm warnings existed "depends on the quantity of information available to the plaintiffs"); *cf. Rochelle v. Marine Midland Grace Trust Co.*, 535 F.2d 523, 532 (9th Cir. 1976) ("Information in public records or published by the news media may be so massive that investors will not be heard to say that they remained ignorant of the financial plight of the corporation involved. . . .") In this case, the

36

extent of media is seventeen articles—four from so-called "mainstream" publications and thirteen from newsletters and publications addressed specifically to the insurance industry as "storm warnings."

The primary mainstream article relied upon by Appellees is the February 14, 1999 *New York Times* article. We find that this article, and the remaining small amount of public information available about contingent commissions at The Hartford, was not enough to create a duty to inquire. On this record, we cannot say as a matter of law that an ordinary investor who stumbled across this article would have inferred that The Hartford was involved at all. That is a far cry from the District Court's conclusion that it was "especially likely" that The Hartford was implicated by the article. *Staehr*, 460 F. Supp. 2d at 338.

As we have noted, none of the other three mainstream press stories in the record mentions The Hartford, either. Nor do twelve of the thirteen articles from industry newsletters. We stated in *Lentell* that, "Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate." 396 F.3d at 169. Because nearly all of the stories in the record are devoid of company-specific information, the argument that they constitute "storm warnings" is far from compelling. To be sure, we have expressly declined to limit a finding of inquiry notice to company-specific storm warnings: "We do not mean to suggest that inquiry notice could never be established on the basis of non-specific public pronouncements, but the level of particularity in pleading required by the PSLRA is such that inquiry notice can be established only where the triggering data 'relates directly to the misrepresentations and omissions' alleged." *Lentell*, 396 F.3d at 171 (quoting *Newman*, 335 F.3d at 193) (emphasis omitted). However, the fact remains that the specificity of storm warnings bears directly on the

37

determination of whether, under the totality of the circumstances, a plaintiff should be charged with a duty to inquire.

The "secondary wrongdoer" cases that have come before us are worth examining briefly, because these cases involved storm warnings that were not specific to the company whose stock price was allegedly affected by fraud. In *Levitt*, we acknowledged that a "case involving the liability of a secondary wrongdoer" is "not a typical storm warnings case." 340 F.3d at 103. In that case, we held that the plaintiffs could not allege a prima facie case against Bear Stearns, a secondary wrong-doer, simply by examining the financial statements of and media coverage about, the issuer whose stock price fell. And in *Lentell*, we held that media reports about conflicts within financial firms (the secondary wrongdoers) did not suggest to investors in *other* companies that Merrill Lynch's analyst reports falsified information about *those companies*. *Lentell*, 396 F.3d at 170-72.

In *Shah*, we further explained (and contrasted) *Lentell* and its discussion of secondary wrongdoers:

> [I]n *Lentell* . . . articles cited by the district court [that] strongly suggest grounds to believe that certain investment recommendations were less than candid, but in which neither company [recommended by defendants] is mentioned, cannot put the holders of unmentioned companies on inquiry notice that those companies were the subject of unobjective ratings. In the instant suit, by contrast, the reports triggering a duty to investigate are not limited to those mentioning specific corporations whose stocks were overrated. An article specifically describing the business practices *at Morgan Stanley* that serve as the basis of Shah's complaint as a holder of stock *in Morgan Stanley* must be regarded as a "storm warning" of the fraud alleged. 435 F.3d at 251 (internal quotation marks omitted).

The case against The Hartford does not concern a secondary wrongdoer. Appellants' complaint alleges that Appellees' misrepresentations and omissions artificially inflated The

Hartford's *own* stock price. But as was true in *Lentell*, the publicly available information in the record before us consists almost exclusively of generic articles on conflicts of interest for insurance brokers, not insurers. We have described in detail the various media reports principally to underscore the fact that there is no mention of The Hartford at all except in one *National Underwriter* article. We conclude that, on the record before us, that article was not sufficient to trigger inquiry notice as a matter of law..

Appellees attempt to distinguish our decision in *Lentell* – and the nonspecific nature of the news articles discussed therein – by limiting its holding to cases where "secondary wrongdoers" are sued. We find this distinction unpersuasive. Although pleading a claim against a secondary wrongdoer "may be especially difficult," the critical factor for purposes of inquiry notice in *any* case is "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Lentell*, 396 F.3d at 168 (internal quotation marks omitted) (quoting *Levitt*, 340 F.3d at 101). In this most important regard, this case is like *Lentell*, not *Shah*, and the rationale behind *Lentell* cannot be set aside based on a strained "secondary wrongdoer" distinction.

Because we have not created a categorical rule that inquiry notice can only be triggered by public pronouncements containing company-specific information, we do not take issue with the District Court's statement, in the abstract, that "information that is not so company-specific may also suffice for a court to find that the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Staehr*, 460 F. Supp. 2d at 339. This statement may be true in *some* cases. However, the District Court's application of this principle to the facts of *this* case is erroneous. The news reports in the record were insufficient to give a reasonable investor notice of a probability that they might have been defrauded. The

contingent commission schemes in this case were not publicized extensively until 2004— three years after the date when constructive notice was triggered, according to the District Court. (*See* J.A. 183-91, 196-98 (press releases, news articles, and filings from 2004 discussing the NYAG action).) The pre-2004 press clippings in the record do not resemble those in cases like *Shah*, where feature articles describing the subject of the suit (Morgan Stanley's analysts) appeared prominently in popular and widely read publications such as *Fortune*. The articles identified by Appellees are much more similar to those that we found insufficient to trigger inquiry notice in *Lentell*; they are general articles about structural conflicts in an industry, rather than being specific to the company in which Appellants hold stock. Indeed, the press articles in this case are even less indicative of the fraud alleged in the complaint than the articles we found deficient in *Lentell*.

Appellees also would have us distinguish *Lentell* on the basis that the press reports in this case clearly indicate that contingent commission schemes were "industry-wide." The District Court found that argument persuasive:

> A number of the press accounts state that the brokerage industry had been consolidating and that the large majority of the business was controlled by Marsh and Aon. With two or three companies controlling the brokerage industry, they effectively act as a funnel through which much of the insurance business must pass. The *obvious inference* has to be that whatever practice the brokerage companies employ as to some insurance companies . . . they employ as to most or all of the insurance companies.

*Staehr*, 460 F. Supp. 2d at 338 (emphasis added). However, to reach that conclusion, the district court drew factual inferences that were not clearly demonstrated by the press accounts. Such inferences are not appropriately drawn on a motion to dismiss.

The media reports cited by Appellees at most suggest the *potential* for conflicts of interest involving *some* insurers, but not the *probability* of fraud by The Hartford.

40

This is underscored by the very article on which Appellees and the District Court rely most heavily – the *New York Times* article – which specifically said that not all insurers pay contingent commissions, without identifying either those companies that do or those that do not. The references in the articles and newsletters to "contingent commissions" and brokerage firms' conflicts are not specific enough to provide an ordinary investor with indications of the probability (not just the possibility, *see Shah*, 435 F.3d at 249; *Lentell*, 396 F.3d at 168; *Newman*, 335 F.3d at 193-9; *Dodds*, 12 F.3d at 350) of fraud *by The Hartford*. Focusing almost exclusively on brokers' practices, the press articles do not clearly suggest that any insurers committed misconduct. The media reports in the record before us simply do not reveal the scope of The Hartford's schemes as alleged in the action now before the Court.

Our decision in *Shah* was influenced by the fact that the press reports about Morgan Stanley's analysts were so specific. When we distinguished *Shah* from *Lentell*, we stated that inquiry notice was triggered "[b]ecause of the degree of specificity" with which the *Fortune* magazine article described the conflict of interest alleged in plaintiff's complaint. 435 F.3d at 251. The *Fortune* article, we noted, "stands in stark contrast to the 'generic articles on the subject of structural conflicts' that we previously have held to be insufficient to trigger inquiry notice." *Id.* (quoting *Lentell*, 396 F.3d at 170). The *Fortune* magazine article's specific description of the business practices *at the defendant company* (Morgan Stanley), which served as the basis of the plaintiff's complaint against *that company*, was a sufficient "storm warning" of the fraud alleged. *Id.*

Appellees argue that *Shah* compels us to affirm the District Court's decision because the exhibits "specifically describ[ed] the business practices" at The Hartford, and that those practices "serve as the basis of" Appellants' complaint. *See* Appellees' Br. at 43 (internal quotation marks

41

omitted) (quoting *Shah*, 435 F.3d at 251). If anything, *Shah* supports reversal, because in that case the media reports were so issuer-specific and so prominent. In this case, none of the stories that appeared in the mainstream press contains any specific information about The Hartford's business practices— they do not even mention The Hartford by name. The same is true of twelve of the thirteen stories from specialty publications. Just as in *Lentell*, these articles fall short of the specificity required to prompt further inquiry by a reasonable investor. *See* 396 F.3d at 170.

The thirteenth article – the February 14, 2000 story in the *National Underwriter* – does not move this case significantly closer to *Shah*. While it mentions The Hartford (by quoting the one sentence in the *Turner I* complaint that lists The Hartford as one of the insurers who paid contingent commissions), it does so in passing, and in the context of an article concerning practices by brokers— practices that would appear to victimize insurers.

Appellees correctly point out that we noted an article that had appeared in *National Underwriter* when we affirmed the dismissal of the *LC Capital Partners* complaint. However, the principal storm warnings that gave rise to the duty of inquiry in *LC Capital Partners* were not press reports – let alone an article from a niche publication – but the repeated charges against reserves by defendant Frontier. 318 F.3d at 155. Moreover, the *National Underwriter* article mentioned in *LC Capital Partners* recited information about a lawsuit already filed against Frontier. By contrast, the February 14, 2000 *National Underwriter* article in this case appeared a year and a half before the filing of *Turner II,* the first lawsuit that named The Hartford as a defendant.

42

In short, we cannot say either that this article would have come to the attention of a reasonable investor of ordinary intelligence, or that, if it had, its contents were sufficient to place such an investor on notice of the probability of fraudulent conduct by The Hartford.

After oral argument, Appellees provided us, pursuant to Federal Rule of Appellate Procedure 28(j), with the Third Circuit's decision in *DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209 (3d Cir. 2007). Appellees assert that this decision "bears directly upon" Appellants' arguments regarding the extent to which "storm warnings" must be company-specific, and that it is consistent with *Lentell* in holding that articles and press releases that do not identify the defendant by name can be sufficient to trigger a duty of inquiry.

*DeBenedictis* concerned allegations that Merrill Lynch's brokers had a conflict of interest with regard to the sales of Class B mutual fund shares – shares for which they received larger commissions – by selling these shares to investors even though the mutual funds might not be in the investors' best interest. 492 F.3d at 210. The fund's registration statements contained tables and charts setting forth the fees and expenses for different classes of shares, and a description of how the fee structure for each class affects its desirability. *Id*. at 210-13

The district court dismissed the complaint as time-barred, having taken judicial notice of articles from *USA Today* and *Time Magazine* – published more than two years before the lawsuit was initiated – which reported the conflict of interest that existed in the mutual fund industry with respect to Class B shares. *Id*. at 214-15. The court also took notice of NASD news releases reporting that brokers were disciplined for making unsuitable recommendations in selling Class B shares to customers. *Id*. The district court found that the "registration statements, *coupled with* the news articles and NASD press releases, sufficed to trigger inquiry notice." 492 F.3d at 215 (emphasis added) (internal quotation marks omitted). The Third Circuit affirmed,

43

concluding that the materials relied on by the district court were sufficient to put an investor on inquiry notice. *Id*. at 218-19.

Appellees argue that, in the Third Circuit's view, the non-specific news articles in *DeBenedictis* were sufficient to place plaintiffs on inquiry notice. But we do not read *DeBenedictis* as holding that the non-specific articles and press releases were sufficient, without more, to trigger inquiry notice. The Third Circuit observed, "News reports are not given weight by courts in a vacuum, but rather have significance in cases where investors are presumed to have read prospectuses . . . and other information related to their investments." *Id*. at 217 (internal quotation marks omitted). This conclusion is consistent with our holding in *LC Capital Partners*, where the reserve charges themselves were the "principal warnings," and an industry newsletter simply "[a]lso contribut[ed] to a duty of inquiry." 318 F.3d at 155.

In *Debenedictis*, the widespread news coverage of mutual funds' sales practices regarding Class B shares should have alerted a reasonable investor to consult the prospectuses he received to determine whether he was a victim of the fraud described in the news reports. Similarly, in *Shah*, the specific articles about Morgan Stanley's specific business practices would have alerted a Morgan Stanley investor to the probability of fraud. In this case, however, the non-specific and barely publicized news reports in this record did not reasonably provide Appellants with a similar level of knowledge or awareness of the fraud alleged. Given the sparse and non-specific coverage in mainstream media reports, The Hartford's shareholders would not have been on the lookout for unpublicized state court pleadings or obscure state regulatory filings, and thus they would not have been reasonably aware of those public materials.

Appellees contend that actual notice of certain facts may be presumed. *See* Appellees' Br. at 37. However, the only Second Circuit case cited by Appellees to support this broad

44

proposition is an inapposite thirty-year-old decision that found omissions in a proxy statement to be immaterial because a reasonable investor would have had certain information readily available to him. *See id.* (citing *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 953 (2d Cir. 1978).) Appellees also argue that the difficulty of obtaining information should not be a criterion for triggering the duty of inquiry, because if it were, investors would be mere passive actors with respect to their investments. *See* Appellees' Br. at 58. This contention, too, ignores the objective character of the inquiry notice standard. Even if a particular plaintiff-investor acted passively with regard to his or her investments, that plaintiff would be charged with knowledge of information reasonably accessible to an investor of ordinary intelligence.

Given the objective standard for inquiry notice, there is an inherent sliding scale in assessing whether inquiry notice was triggered by information in the public domain: the more widespread and prominent the public information disclosing the facts underlying the fraud, the more accessible this information is to plaintiffs, and the less company-specific the information must be. In finding that the "storm warnings" were sufficient to trigger inquiry notice in this case, the District Court necessarily concluded that an ordinary investor would come across the judicially noticed materials submitted by Appellees, *i.e.*, that these materials were reasonably accessible. Based on the record before us, we simply cannot agree.

With the exception of the *New York Times* article, the two *Financial Times* articles, and the *Chicago Tribune* blurb, the articles judicially noticed by the District Court were from industry newsletters. (J.A. 212-15, 229-36, 265-66.) These articles were not sufficient to put investors on inquiry notice. We have never affirmed the dismissal of a complaint as time-barred based on a story that appeared only in a specialty publication, as opposed to mainstream press reports that are more likely to come to the attention of an investor of ordinary intelligence. We

45

are reluctant to affirm such a dismissal where, as here, the specialty publication coverage is relatively minimal and we do not know the publications' circulation or the extent to which a reasonable investor would be aware of the limited coverage.

Appellees place too much importance on *LC Capital Partners*, given the significant differences between that case and this one. First, in *LC Capital Partners*, we made clear that other publicly available documents were important to creating the duty to inquire. 318 F.3d at 155. Second, the *National Underwriter* article in *LC Capital Partners* included company-specific information with regard to its discussion of the defendant's problems that gave rise to the "principal warnings." *Id.* Third, the *National Underwriter* article in *LC Capital Partners* repeated information that had already been the subject of previous lawsuits and disclosures.

Even assuming, *arguendo*, that an investor of ordinary intelligence would regularly search various newsletters and information databases for news about the companies in which he or she invests, this endeavor would not have been fruitful for an investor searching for information about The Hartford, given the dearth of specific information about The Hartford or insurers generally in the press articles judicially noticed by the District Court. It is for this reason that the District Court could only take notice of the press articles for what they said about the insurance industry as a whole. This is also why the District Court set July 25, 2001, as the notice triggering date (when the *Turner II* lawsuit named subsidiaries of The Hartford as defendants).

### 2.	Regulatory Filings

As part of their argument that the totality of public information put Appellants on inquiry notice by July 25, 2001, Appellees rely on the state regulatory filings that they submitted. They

also point to the two-page excerpt they submitted from The Hartford's Form 10-K for the year 2000 (filed with the SEC on March 23, 2001).

The District Court briefly mentioned the regulatory filings, but it does not appear to have given these filings any weight in holding that Appellants' claims were time-barred. *Staehr*, 460 F. Supp. 2d at 338 ("There is no doubt that the *lawsuits and press accounts* clearly spelled out the existence of contingent commission kickback schemes between insurance companies and brokers." (emphasis added)).

Furthermore, the state filings do not provide specific information that would suggest to a reasonable investor the probability of fraud by The Hartford. In *Newman*, we held that, even where the defendant's Form 10-K contained specific information about write downs and accounting charges that later formed the basis for fraud allegations, the plaintiffs were not placed on inquiry notice by the 10-K, because the statements contained therein were not presented with "clarity sufficient to place Plaintiffs on inquiry notice that there was a probability of fraud." 335 F.3d at 194. The 10-K did not indicate that certain costs stemmed from fraud, so it was reasonable for plaintiffs not to inquire further, particularly in light of the defendant's "seemingly benign explanation" for the costs. *Id.*

Similarly, The Hartford's filings did not indicate that the contingent commission expenses stemmed from fraudulent schemes. On the insurance exhibits, the category "Commission and Brokerage" and the column heading "Acquisition, Field Supervision and Collection Expenses" – under which the "contingent commissions" fall – are seemingly benign categories of expenses in the absence of further explanation. The same can be said for the "Revenue Recognition" subsection of The Hartford's Form 10-K, within which the term "contingent commissions" is used.

Appellees maintain that these filings "specifically refer to payments of *contingent* commissions," which is the very evil decried in the complaint. *See* Appellees' Br. at 44 (emphasis added). The Form 10-K does use the phrase "contingent commission" in one subsection. This is quite significant, because we normally will charge investors with notice of the information in the 10-K. However, the 10-K at issue here did not define the term at all or give any indication of its significance. The term was defined in some other newspaper articles, and we might be inclined to charge investors with notice of information in the newspaper articles when it is sufficiently widespread. However, the record The Hartford has compiled in this case shows only a very small number of articles explaining the significance of the term "contingent commissions," and for the reasons discussed, we cannot conclude that a reasonable investor of ordinary intelligence would have encountered these articles. Hence, we cannot assume that an investor reading the 10-K would have understood the reference to "contingent commissions."

We emphasize that our decision in this case is not meant to cast doubt on the usefulness of 10-Ks and other disclosure documents generally as a means of putting investors on constructive notice of facts about the company. We find significant in this case the fact that the Defendant was able to put forward only a vanishingly small set of articles. More articles in mainstream publications discussing the "contingent commissions" issue, combined with a reference in the 10-K, would present a different case. It suffices to say that the record adduced here was not enough to convince us that a reasonable investor would have notice, as a matter of law, of the probability of fraud.

### 3. Lawsuits

Finally, with regard to the four lawsuits filed in different state courts, the *Daniel* and *Village of Orland Hills* lawsuits do not mention The Hartford at all. The *Turner I* suit briefly

mentions the company's name but does not specifically accuse it of wrongdoing, let alone the wrongdoing that is the subject of this action. Thus, the *Daniel*, *Village of Orland Hills*, and *Turner I* lawsuits would not have alerted a reasonable investor of ordinary intelligence to inquire about inflated financial performance and bid rigging at The Hartford.

However, the *Turner II* lawsuit does name as defendants nine insurance subsidiaries of The Hartford (although not the defendant in this case, The Hartford Financial Services Group, Inc.), alleging that they violated California law by paying kickbacks to certain insurance brokers. The allegations in the *Turner II* complaint are similar to the claims of kickbacks and misrepresentations alleged by Appellants in this case. For this reason – and because the District Court found that inquiry notice was triggered as of the *Turner II* filing date – we pay close attention to the *Turner II* complaint.

Although *Turner II* does not allege that The Hartford's subsidiaries misled investors by touting The Hartford's business success without disclosing that this success was premised on bid-rigging and revenue inflation schemes, "storm warnings" need not detail the entire fraud. *See Dodds*, 12 F.3d at 352. If a complaint alleges various frauds, an investor need not know the details of each fraud in order to be placed on inquiry notice. For example, in *LC Capital Partners*, the plaintiffs alleged several types of misconduct, including under-reserving for insurance claims and predatory pricing. 318 F.3d at 150. We affirmed the dismissal of the complaint, stating that the storm warnings related to under-reserving should have "alert[ed] any reasonable investor that something is seriously wrong." *Id.* at 155. Thus, despite Appellants' characterization of our precedents, these decisions would not prevent us from finding that *Turner II* triggered inquiry notice, even though that complaint did not discuss the bid-rigging scheme that is one of the bases of their complaint.

49

Appellants argue that, at most, the state court complaints submitted by Appellees might have suggested that there was a possible conflict of interest within the insurance industry, but not a widespread fraud being perpetrated by The Hartford. Appellants rely on *Lentell* to support this argument. *See* 396 F.3d at 170.

We find Appellants' argument unpersuasive as it pertains to the contents of the *Turner II* lawsuit. The *Turner II* complaint did not merely signal the existence of a possible conflict of interest in the insurance industry, but rather was grounded on an alleged failure by The Hartford to disclose the payment of contingent commissions. For example, *Turner II* alleged that The Hartford's subsidiaries "fail[ed] . . . to disclose the . . . Undisclosed Fees and Commissions to policyholders," and that they "falsely represent[ed] to policyholders that the Included Brokers would only be paid a disclosed commission . . . ." (J.A. 144.) This allegation does not just hint at a temptation by The Hartford to commit fraud, but rather is the same basis of fraud alleged by Appellants in the Complaint.

Although we do not underestimate the importance of the bid-rigging schemes alleged in this case, we agree with the District Court that the contingent commission kickback schemes are central to the Complaint, and that the alleged deception and fraud by The Hartford concerns the failure to disclose these schemes. *See Staehr*, 460 F. Supp. 2d at 339. *Turner II* described the failure of The Hartford's subsidiaries to disclose the kickback schemes; thus, there was some public information out there that suggested a substantial amount of the fraud alleged by Appellants. *See id*. at 338. Specific allegations that The Hartford's subsidiaries failed to disclose kickback schemes, which are made in *Turner II*, should alert a reasonable investor that something is wrong, *LC Capital Partners*, 318 F.3d at 155, and thus would trigger a duty to

50

inquire further. This conclusion is bolstered by our statement in *Dodds* that an investor need not have "notice of the entire fraud being perpetrated to be on inquiry notice." 12 F.3d at 352.

Because the *Turner II* complaint contains allegations that are similar to some of the key allegations in the instant complaint, we agree with the District Court that the filing of the *Turner II* lawsuit would trigger inquiry notice— but only if an investor of ordinary intelligence would have been reasonably aware of the complaint. The dispositive issue, therefore, is whether the *Turner II* complaint was reasonably accessible to an ordinary investor. We conclude that it was not.

As we have already explained in detail, the *Turner II* lawsuit was not referenced in *any* of the news articles or regulatory filings offered by Appellees. It would be unreasonable to expect an ordinary investor to be aware of this lawsuit under these circumstances. We cannot say that the reasonable investor of ordinary intelligence would or should have known about a lawsuit filed in an unlikely venue (a California state court), that received no publicity whatever (not even in niche publications) and that did not, at least based on the record before us here, result in published or broadly disseminated opinions within the relevant time period. It has not been demonstrated that this obscure and unpublicized lawsuit was reasonably accessible to such an investor.

Appellees argue that, if the plaintiff in *Turner II* could detect "storm warnings" that would cause him to file a lawsuit containing allegations of fraud against The Hartford's subsidiaries as of July 2001, then so, too, could the Appellants in this case. There is a fundamental flaw to this argument, however: Scott C. Turner, the plaintiff in *Turner II*, was not an investor of ordinary intelligence, but rather a lawyer affiliated with the firm Anderson, Kill & Olick P.C.— a law firm that touts its insurance law practice and is known for battling

51

commercial insurers.[2] An insurance lawyer might very well have a sophisticated understanding of the insurer-broker business, but he does not set the standard. The fact that an investor of more-than-ordinary intelligence filed a lawsuit against subsidiaries of The Hartford in 2001 cannot be used as a bellwether for the adequacy of the "storm warnings."[3]

Following oral argument, Appellees submitted two recent unpublished opinions from this Court concerning inquiry notice: *Masters v. GlaxoSmithKline*, 271 F.App'x 46 (2d Cir. Mar. 26, 2008), and *Domenikos v. Roth*, 2008 WL 2329315 (2d Cir. June 5, 2008). Of course, these summary orders have no precedential effect on our analysis. *See* Local R. 32.1(b). However, the facts of the two cases – which involved highly publicized class actions that could not have escaped the notice of any reasonable investor - are so different from the facts before us that nothing in the cited orders causes us to question our conclusion in this case.

## III.    CONCLUSION

In light of the foregoing, we **VACATE** the District Court's decision granting Appellees' motion to dismiss the complaint as time-barred, and we **REMAND** this case to the District Court for further proceedings not inconsistent with this opinion. We express no views about the merits of the other grounds for dismissal raised by Appellees in their motion to dismiss, since the District Court never reached them.

---

[2] *See* J.A. 213, Roberto Ceniceros, *Suit Asks Brokers to Return Contingent Commissions*, *Business Insurance*, Feb. 14, 2000, at 1; *see also* Anderson Kill & Olick, http://www.andersonkill.com/about_Anderson_Kill.asp (last visited November 14, 2008).

[3] Perhaps for this same reason, the February 14, 2000 *Business Insurance* article reported the senior litigation counsel for Aon Corporation as saying, "Let everybody draw their own conclusions" about the fact that an attorney was the only named plaintiff in the *Turner I* lawsuit. (*See* J.A. 213-14.)